THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
BRUNO RICHARD HAUPTMANN, PLAINTIFF IN ERROR.

Argued June 20, 1935—Submitted on Supplemental Briefs,
July 15, 1935—Decided October 9, 1935.

For the plaintiff in error, *Egbert Rosecrans* and *Frederick A. Pope.*

For the state, *David T. Wilentz,* attorney-general (*Joseph Lanigan* and *Robert Peacock,* assistant attorneys-general, and *Anthony M. Hauck, Jr.,* prosecutor of the pleas, on the brief).

The opinion of the court was delivered by

PARKER, J.   The plaintiff in error was indicted for murder by the grand jury of Hunterdon county, was tried in that

county and convicted of murder in the first degree without recommendation of life imprisonment, and brings this writ of error.

The victim of the alleged murder was Charles A. Lindbergh, Jr., a child less than two years old on March 1st, 1932, the date laid in the indictment. On that evening, according to the testimony, the child was put to bed about eight o'clock, and was left asleep in the house of his parents at East Amwell in the county of Hunterdon. About ten o'clock, when the nurse returned to the room, the child was missing, and indications detailed in the evidence pointed to a kidnapping. On the window sill was a letter testified to be in the handwriting of the defendant, demanding $50,000 ransom and signifying that later instructions as to method of payment would be forthcoming. This led to negotiations, in the course of which a number of other notes were received; and on the evening of April 2d, Dr. Condon, an agent of Colonel Lindbergh the father, met a man, who, as the state claimed and he testified was the defendant, at a cemetery in the Bronx, the money was paid in bills capable of later identification, the parents having already received as proof that the kidnapper had the child, a little sleeping suit which the child had on at the time of the kidnapping, and which figured as an important piece of evidence. The baby himself was never returned, and, as shown to the satisfaction of the jury by the evidence, had long been dead. His mutilated and decomposed body was accidentally discovered on May 12, in a shallow grave several miles away in the adjoining county of Mercer. The state claimed, and evidence supported the claim, that the autopsy disclosed the baby had suffered three violent fractures of the skull and that death was instantaneous.

As the result of investigations continued over many months, the detective and prosecuting authorities procured the arrest of the defendant, a resident of the Bronx, on a charge of murder. He resisted extradition, but was ultimately surrendered by the New York state authorities. The present indictment was returned on October 8th, 1934, and the trial began January 2d, 1935, and continued until February 13, 1935, on which day defendant was found guilty as above stated, and

sentenced to suffer the death penalty. Argument on the writ of error was deferred until June 20th at the special request of counsel for the plaintiff in error, and to afford them time to procure the printing of the ten-volume state of the case. It is not necessary at this point to go into an extended discussion of the evidence. Certain special features of it will be considered in connection with the several points made for reversal and particularly in connection with weight of evidence. It is proper to note, however, as a matter of common knowledge, the existence of great popular excitement before and throughout the trial, and of a crowded court room at all stages of the case.

The case is brought up both on bill of exceptions, and on a certificate of the entire record of proceedings at the trial pursuant to section 136 of the Criminal Procedure act. *Comp. Stat., p.* 1863. The assignments of error are arranged in Groups A to R, inclusive: the causes for reversal under the additional statutory review run similarly from A to V. They are not identical throughout. The fundamental inquiry, in the language of the cited statute, is whether defendant on the trial "suffered manifest wrong and injury, either in the admission or rejection of testimony * * * or in the charge of the court, or in the denial of any matter by the court which was a matter of discretion, * * * provided, no judgment * * * shall be reversed for any * * * error except such as shall or may have prejudiced the defendant in maintaining his defense upon the merits."

As to the *corpus delicti,* little or no question was raised. The identity of the dead child was expressly admitted. The question whether an indictment would lie in Hunterdon was vigorously argued. Apart from this, the main contest was over the question whether defendant was the guilty man, the state claiming that he was, and he claiming the contrary, that he was never at the place of the crime, knew nothing about it, and had nothing to do with it. Certain questions of law were argued below and again in this court. The brief for plaintiff in error, which was followed at the argument, presented the case under sixteen points, grouping assignments of error and causes for reversal where they are cognate; and

these points will be considered in the order appearing on the brief.

Point I is that "the summation of the attorney-general violated the legal and constitutional rights of the defendant."

As may be surmised, the summation on both sides was lengthy. That by Mr. Reilly, of the New York bar, for the defense, covers one hundred pages of the printed case; that by the attorney-general, one hundred and thirty-five pages. From this latter counsel for plaintiff in error have extracted a number of passages, which, as they claim, amounted to illegal and unconstitutional abuse of the rights and privileges of an arguing advocate and charge error on the part of the trial judge in failing to intervene and restrict the speaker to his legitimate line of argument. Some are expressive of a belief in defendant's guilt on the part of prosecuting officers; some are vituperative characterizations of defendant, given his guilt. One or more intimate that the jury would be guilty of a crime in failing to convict. But we find no legal error properly raised. Throughout the lengthy summation it was at one juncture, and one only, that defense counsel interposed with an objection that the state counsel was going outside the evidence. We shall return to this presently. With that exception the four lawyers representing defendant and employed by him, said nothing by way of protest.

The pertinent rule in this state is well settled, and was enunciated in this court by the late Chancellor Walker in *State* v. *Terry,* 91 *N. J. L.* 539, 543, where he said:

"The rule in this state, undoubtedly, is, that where counsel in summing up to the jury, goes outside of the testimony and makes appeals based upon facts which have not been proved, but rest upon his unsupported assertions, the party injuriously affected must, in order to be relieved, move the trial judge to order the remarks stricken out and to charge the jury that they should be disregarded; an objection only to the illegal remarks does not require the trial judge to strike them out of his own motion, and unless counsel requests their elimination no ground for review is laid."

In *State* v. *Barker,* 68 *N. J. L.* 19, a Supreme Court case, opinion by the late Chief Justice Gummere, it was held:

"Where the testimony, introduced at the trial of an indictment, clearly shows the guilt of the accused, a statement made by the prosecutor of the pleas, in his summing up to the jury, that 'a verdict of acquittal would be a miscarriage of justice,' affords no ground of exception."

In *State* v. *Lang*, 75 *N. J. L.* 1 (at *p.* 7), the Supreme Court held the prosecuting attorney, in view of the evidence, to be within his privilege in describing the defendant, as "a monster in his passions, licentious in his desires, beastly in his love, brutal when thwarted and cowardly when caught." The case came to this court on writ of error (*Id., p.* 502), and the judgment was affirmed for the reasons stated in the Supreme Court opinion (see page 513) except on the point of a challenge to the jury. On that point alone it was carried to the Supreme Court of the United States and again affirmed. 209 *U. S.* 467; 52 *L. Ed.* 894. The abstract of counsel's brief shows that no other point was even suggested.

In *State* v. *Biango*, 79 *N. J. L.* 523, this court held that improper remarks by prosecutor in the absence of timely objection and request for action by the court, are no basis for reversal either on strict writ of error or under section 136, *supra*.

In *State* v. *McCormack*, 93 *N. J. L.* 287, the prosecutor, in summing up, said: "Would I, district attorney, having delved in this case for months, urge this prosecution if I did not believe what the prosecutrix said was true?" The Supreme Court said this was improper; but pointed out that when defendant's counsel objected and asked that the remarks be withdrawn, the prosecutor at once withdrew them and asked that they be disregarded. This was in accord with the practice outlined in State *v.* Terry. The McCormack case came to this court and the judgment was affirmed on the opinion of the Supreme Court. 94 *Id.* 262.

In *State* v. *Corson*, 108 *N. J. L.* 12, the prosecutor during his summation made a prejudicial remark not justified by the proofs. Counsel for defendant asked the court to withdraw a juror and award a mistrial; but the Supreme Court pointed out the rule in State *v.* Terry, and said that in such a case the party injuriously affected must, in order to be

relieved, move the court to order the remarks stricken out and to charge the jury that they should be disregarded; and, this course not having been taken, no reversal could be had. The judgment was affirmed in this court (109 *Id.* 144), on the opinion of the Supreme Court except as to one point not here relevant.

The very recent case of *Berger* v. *United States,* 295 *U. S.* 78; 79 *L. Ed.* 667; 55 *Sup. Ct.* 629, is relied on for reversal on this phase of the present case. But as we read the opinion, the reversal is predicated on grossly improper conduct by the district attorney plus a weak case on the evidence, which latter is far from being the situation here. It may be well further to note that the leading counsel for the defense in the instant case, who summed up to the jury, anticipated the attorney-general when he remarked at the outset that "this is the crime of the century and it is the worst crime and the lowest type of crime ever committed, to my knowledge, according to any of the books I have ever read;" and as he was closing: "I have tried to be honest  *  *  *  I believe this man is absolutely innocent of murder." We are far from setting the seal of approval on any statement of the personal beliefs of counsel on either side as to the fact of guilt or innocence. But it is unnecessary to discuss the matter in detail, as we deem the rule in State *v.* Terry applicable, and that this case shows no such elements of factual weakness as the Berger case. Other pertinent decisions are *State* v. *Lockman,* 83 *N. J. L.* 168, and *State* v. *Parker, Ibid.* 172, 176.

At one point in the state summation there was an interruption and an objection, as already noted.

A witness named Sisk, sworn for the state, was under cross-examination, and testified as follows:

"*Q.* Now, isn't it a fact that after talking to Dr. Condon you had Dr. Condon imitate the voice of John at the cemetery and that imitation recorded on Victrola records? *A.* Why, we—— *Q.* Did you or not? *A.* Yes, sir, we did. *Q.* Where are those Victrola records? *A.* Well, there was only one record, and I believe that is in Washington. *Q.* May we obtain it? *A.* Yes, I suppose so. *Q.* Can you get it? *A.* It will take a couple of days."

Mr. Reilly, alluding to this in his summing up, said: "I challenged them—I produced evidence that Condon repeated as best he could the voice he heard and it was made on a Victrola record and I challenged them to produce it and they admitted they had it and they don't bring it in here and they don't bring in the footprint. Now why? Because the footprint does not fit the defendant's, even the imitation of it. And then they talk about justice! Justice! Hang this man and cover up our sins."

The attorney-general in his reply said: "Then, counsel wants to know where is the phonograph record? Did you hear him ask Mr. Sisk, of the department of justice, if there was such a record, and did he have it, and would he produce it? Why, sure, that phonographic record has been alive and awake waiting for him to call for it, to put his voice on for you.

"I would have loved if you had heard the story all over again, Condon telling about this conversation, 'will I burn if the baby is dead? Are you German, John? No, I am Scandinavian. Have you got the money? No, I haven't got the money. Doesn't Colonel Lindbergh think we are the right party?' "

Mr. Reilly objected that this was "something which he assumes would be in the record, if it was called for * * *." The attorney-general explained that he was talking about Dr. Condon's testimony. Mr. Reilly admitted to the court that he had asked one of the witnesses about the record, and "would he bring it." The court ruled that the attorney-general had not gone outside the evidence, and the defense excepted.

But quite plainly, what the attorney-general was quoting was from the testimony of Condon, not from a phonograph record. The substance of what he quoted will be found in that testimony. The obvious construction to be placed upon the remarks of the attorney-general was that the defense were afraid to call for and produce the phonograph record because they felt that if produced and played before the jury it would be found to repeat what Dr. Condon had testified to in regard to his interview with the defendant at the cemetery. The

question whether the record could have been made admissible as evidence (see *State* v. *Simon,* 113 *N. J. L.* 521; 115 *Id.* 207) did not come up for consideration. We agree with the trial judge that counsel was within his rights in challenging the failure of the defense to call for the record as due to fear of what it might and probably would show.

In connection with Point I, and under a heading of I-A, it is argued that the attorney-general argued with, and bullied the defendant and other witnesses on cross-examination. So far as the defendant himself is concerned, a rigid cross-examination was fully warranted. The state's direct case against him was strong, and as already noted, the main defense was denial of any participation in the crime, or presence at the scene. Defendant had admitted false statements in the New York proceedings; he assumed an evasive attitude on cross-examination; he admitted a series of crimes, convictions and criminal escapes in Germany, two unsuccessful attempts, and a third successful attempt to make unlawful entry into this country. We can find no objection by his learned and astute counsel, except at one point, where one of his counsel intervened, saying, "well, I think this has gone just about far enough." The question just asked and not answered was withdrawn, and a short colloquy ensued, in the course of which counsel said: "It seems to me it is about time we protested against it. It has been going on for quite a while." The court: "Whenever you have any occasion to protest, you make your protest to the court while the thing is going on, and the court will deal with it; it always has and will continue to do so." The cross-examination proceeded without further objection for fifteen pages of the printed book; a question was then objected to and overruled unanswered, the judge saying, "yes, that is objectionable. I sustain the objection." The cross-examination then proceeded without substantial interruption for over one hundred pages more. Our conclusion on this point is that it is without merit.

Point II is that "there was a material variance in the theory of the state and the proofs." This grows out of the fact that the attorney-general in opening the case, and the prosecutor

of the pleas in his opening argument at the end of the proofs, relied upon the theory that the death of the child occurred when he was being taken out of the nursery down the ladder, which broke and he was precipitated to the ground; while the attorney-general argued in his closing summation that the child was beaten into insensibility in the nursery; and that perhaps the child was dead or insensible when removed from the house. But this latter was not the theory on which the case was submitted to the jury. And the substantial claim throughout was that the defendant feloniously opened the window, seized the child and its clothing, and attempted to escape through the window again, and that the injuries that caused the child's death were inflicted during the perpetration of that felonious and unlawful act. The variance, if such there was, made, and could have made no difference in the defense, which was that the defendant was not there. Moreover, there was apparently no objection made, no exception taken, no request for an opportunity to reply to the argument freshly presented, no request for a jury charge based thereon. It is urged that the court should have charged, as requested, that there was no evidence of a willful, deliberate and premeditated murder by the defendant. Again, the case was not submitted to the jury by the court on any such theory. It was submitted on one theory, and one alone, viz., of homicide in the perpetration of a burglary. No such situation existed as that in *State* v. *Jones,* 115 *N. J. Law,* 257, where at the last moment the theory of the prosecution shifted from robbery to burglary.

We find no error here.

Point III is stated in the brief as follows:

"Public policy is the policy of the law expressed in and derived from the constitution, laws and judicial decisions."

This heading, of course, states nothing which is challenged as error; but the brief goes on to argue "that a reading of the specifications referring to the summation and a perusal of the summation itself should lead this court to the conclusion that there was a violation of a legal rule founded upon public policy, which rule, it is contended, requires that the prosecuting attorney must conduct the trial in accordance with

and confine his summation within the rules of law and that it further becomes the duty of the court to see that this ancient rule be followed. It would seem to be a weak answer to say that the defendant's counsel should have objected at every opportunity. Many reasons may be advanced why counsel for the defendant in this or any given case might not interpose objection. Nevertheless, trials are not entirely battles of wits and prosecuting attorneys and presiding judges are under a duty to every defendant to observe fundamental rules of law." The brief continues:

"It is also contended that the material variance between the openings, proofs, and summation, relating to the change as to the instrumentality causing death and the place where the death occurred, involving as it did a new theory of willful, deliberate and premeditated killing, resulted in a violation of a question of public policy; for it is a principle well grounded in the law that a defendant should be fairly apprised of the nature and cause of the accusation against him."

These two matters have just been fully treated with the result that we find no error.

However, while specifically admitting that there was only one objection and exception by defendant to the summation, and no exception taken specifically to the alleged variance, nevertheless counsel brought it to the attention of the court, and particularly excepted to that portion of the charge which permitted the jury to find as a matter of fact that the skull fracture was inflicted while the child was being carried down the ladder, and when the ladder broke. Counsel challenged this as not justified by the evidence and as being contrary to the state's theory that the fatal blow was struck while the child was still in the nursery. All this has been already gone over and needs no further comment, except in reply to the reliance of the plaintiff in error on the opinion in this court in *State* v. *O'Leary,* 110 *N. J. L.* 36, where we held that in that case the absence of an exception would not bar a reversal, and placed this on grounds of public policy. However, a glance at that case will show a fundamentally different situation, in that the trial court in the conduct of a murder case disregarded one of the most fundamental rules of the court

procedure in such cases, viz., that the jury should be seques-
tered during the trial; and in fact permitted the members
of the jury to disperse to their homes. This was indeed a
case of public policy, but does not require the extension of
the rule to what may be described as ordinary trial error.

We deem Point III therefore to be without substance.

Point IV is a challenge in another form to the summing
up by the attorney-general and reads as follows:

"The defendant's constitutional rights under the fourteenth
amendment of the constitution of the United States were
contravened by the summation and material variance of
theory."

This is said to be in violation of the fourteenth amendment.
Without repeating here what has already been said under the
first point, we conclude that there was no such infringement
of the federal constitution.

Point V is headed "The venue was improperly laid in Hun-
terdon county instead of Mercer county." What is meant is
that the indictment, if any, should have been found in Mercer
county and tried there. It will be remembered that the child
when stolen was in Hunterdon, and that the body was found
in Mercer. Counsel of course recognized the provisions of
section 59 of our "Criminal Procedure act" (*Comp. Stat.*,
*p.* 1839) that where there is a felonious striking in one
county, and death therefrom occurs in another county, the
indictment may be found in either. Parallel with this is
section 60, covering cases where the felonious striking is
without the state, and death in the state. The case of *State*
v. *James,* 96 *N. J. L.* 132, was a case covered by section 59;
under section 60 we have the recent cases of *State* v. *Lang,*
108 *Id.* 98, and *State* v. *Frazer,* in the same volume at page
504. The gist of the argument, both orally and in the brief,
was and is that there was no evidence to justify the jury in a
finding that there was any felonious striking in Hunterdon
county. The court charged that "the fact that the child's
body was found in Mercer county raises a presumption that
the death occurred there; but that, of course, is a rebuttable
presumption and may be overcome by circumstantial evi-
dence." Clearly the jury were entitled in view of the evidence

to find that some sort of battery was committed in Hunterdon when the child was taken from its bed; and from that evidence might also find that the blows on the head, causing death, were inflicted in Hunterdon. It was not necessary to show death in Hunterdon; proof of a felonious striking in that county; causing death wherever that occurred, was sufficient; and we consider that of such striking there was sufficient proof, even though of a circumstantial character.

Point VI is stated thus: "There was no proof of the common law crime of burglary, and the court erroneously charged the statutory crime."

This, it will be observed, contains two propositions. Both are incorrect. There was proof of common law burglary; and the court did not charge what the brief calls "the statutory crime," *i. e.*, section 131 of our Crimes act. *Comp. Stat., p.* 1787.

As to the first: a burglar, says Blackstone (4 *Blk.* 229) following Coke, is "he that by night breaketh and entereth into a mansion house, with intent to commit a felony." In 1 *Russ. Crimes* \*785, burglary is defined as "a breaking and entering the mansion house of another in the night, with intent to commit some felony within the same, whether such felonious intent be executed or not." In *State* v. *Wilson,* 1 *N. J. L. (Coxe)* 439, Chief Justice Kinsey, charging a jury, defined burglary as "the breaking and entering in the mansion house of another, with the intent to commit some felony therein, and that in the night time."

There was proof to meet all these conditions—a breaking and entering, and into a mansion house; in the night time; and with intent to commit a felony. Only the last merits any particular discussion. The intent is to be gathered from what was done, viz., the stealing of the child and its clothing, as charged by the trial judge. Kidnapping was no felony at common law; but larceny was a felony, whether grand or petit. 4 *Blk.* 94, 229 *et seq; Gardner* v. *State,* 55 *N. J. L.* 17, 652. It is suggested that there was no proof of value of the clothing, and hence that proof of larceny was incomplete; but we see no merit in this. The matter of value was material in trying an indictment for larceny (and perhaps also in

framing such indictment) because of the greater punishment in cases of grand larceny; but as Blackstone says, *ubi supra,* grand and petit larceny are "offenses which are considerably distinguished in their punishment, but not otherwise," and in treating of burglary the distinction is not even alluded to.

As to the first proposition of Point VI, therefore, we think it clear that there was suitable proof of the common law crime of burglary. Then as to the second proposition we are equally clear that the court did not "erroneously charge the statutory crime." By this phrase counsel mean the offense or offenses denounced by section 131 of the Crimes act, which reads as follows (*Comp. Stat., p.* 1787):

"Any person who shall, by night, willfully or maliciously, break and enter any church, meeting-house, dwelling-house, shop, warehouse, mill, barn, stable, outhouse, railway-car, canal-boat, ship or vessel, or other building whatever, with intent to kill, rob, steal, commit rape, mayhem or battery, and his counselors, procurers, aiders and abettors, shall be guilty of a high misdemeanor."

When this language is examined, it will be found that while the word "burglary" is not used, the common law offense of burglary is fully included, and thereby made a high misdemeanor, together with other offenses not amounting to common law burglary, either because committed in other buildings, or with intent to commit some offense not amounting to a felony, particularly a battery. But the elements of common law burglary are all mentioned; viz., the breaking and entering by night a dwelling house with intent to steal. The trial judge, mentioning the statute, it is true, and quoting section 131 in part, proceeded to instruct the jury as follows: "If, therefore, the defendant by night willfully and maliciously broke and entered the Lindbergh dwelling house with intent to steal the child and its clothing and to commit a battery on the child, he committed a burglary; and if the murder was committed in perpetrating a burglary, it is murder in the first degree." Conceding for present purposes the claim of counsel for plaintiff in error that by "burglary" as mentioned in sections 106 and 107, the legislature intended burglary at common law, the quoted instruction was, if anything, too

favorable to the defendant, for it postulated an intent not merely to steal the child's clothing, which would have sufficed, but as well an intent to steal the child and to commit a battery. These, we would point out, were joined not in the alternative but in the conjunctive. To constitute burglary, in the language of the instruction, all three must be included in the intent. Hence the error, if any, was prejudicial to the state rather than to the defendant. We have just said that for present purposes the construction put by defendant's counsel on the word "burglary" in sections 106 and 107, may be conceded; but the question was alluded to in State v. Jones, 115 N. J. L. 257 (at pp. 263, 264), and there passed; and it is needless to consider it now, for reasons just given.

Point VII is that "there was no evidence of intent to steal, and the court erroneously charged the jury" (on that point).

The evidence tended to show that the child when stolen, wore the sleeping garment; that there was no such garment on the body when it was found; that defendant had this garment in his possession; that he so told Dr. Condon at the outset of negotiations for ransom; and agreed to send it to him as evidence that Condon was dealing with "the right party;" that he wrote Condon, saying that the ransom would be $70,000 and that ("we") would send the sleeping suit though it would cost three dollars to obtain another one; that the ransom must be paid before seeing the baby, and eight hours after payment Condon would be notified where to find the baby. The sleeping suit came by mail, and then Condon put a reply advertisement in a New York paper, accepting the proposition conditionally.

The claim now made is that in view of the surrender of the sleeping suit, there was no larceny; relying on the rule declared in such cases as State v. South, 28 N. J. L. 28, that an intent to deprive the owner permanently of his property must be an element in the taking of that property. So in a class of cases which may be loosely described as borrowing without leave and with intent to return after temporary use, the courts seem to hold that larceny is not committed. In the South case the court reversed for an instruction to the jury that it was larceny notwithstanding an intent to return after

temporary use. A similar case is *State* v. *Bullitt*, 64 *Id.* 379. In *State* v. *Davis*, 38 *Id.* 176, it was held that abandonment of the "borrowed" property [a horse and wagon] justified an inference of an intent to deprive the owner permanently of his property. But the intent to return should be unconditional; and where there is an element of coercion, or of reward, as a condition of return, larceny is inferable. 36 *C. J.* 769, §§ 120, 122. Mr. Bishop adds, "and perhaps it should be added, for the sake of some advantage to the trespasser—a question on which the decisions are not harmonious." 2 *Bish. New Crim. L.*, § 758, especially note 22 *Id.*, §§ 841 a, 842. At section 843 he says: "But the true view, where the rule of *lucri causa* is concerned, is simply that he should mean some advantage to himself, in distinction from mischief to another." In *Com.* v. *Mason*, 105 *Mass.* 163, it was held larceny to take a horse found astray on the taker's land, and conceal it either to get a reward when advertised, or induce the owner to sell it "astray." In the present case the evidence pointed to use of the sleeping suit to further the purposes of defendant and assist him in extorting many thousand dollars from the rightful owner. True, it was surrendered without payment; but on the other hand, it was an initial and probably essential step in the intended extortion of money, and it seems preposterous to suppose that it would ever have been surrendered except as a result of the first conversation between Condon and the holder of the suit, and as a guarantee that there was no mistake as to the "right party." It was well within the province of the jury to infer that if Condon had refused to go on with the preliminaries, the sleeping suit would never have been delivered. In that situation, the larceny was established.

Point VIII is that "the burglary, if any, was complete in Hunterdon county and separable from the murder presumed to have been committed in Mercer county." The gist of this is that the burglary, if any, was complete before any homicide was committed. That would be largely a question of fact in any event; but in dealing with it, the rule applicable is not that of the New York cases cited in the brief, but of our New Jersey courts, laid down in such cases as *State* v.

*Carlino,* 98 *N. J. L.* 48; *State* v. *Turco,* 99 *Id.* 96, cited by plaintiff in error, and *State* v. *Gimbel,* 107 *Id.* 235. To these may be added *State* v. *Mule,* 114 *Id.* 384, in which the New York case of *People* v. *Giro,* 197 *N. Y.* 152; 90 *N. E. Rep.* 432, is cited with approval. As to the argument that the crime of burglary is complete when there is a nocturnal breaking and entering with intent, that is doubtless true for the purposes of a conviction of burglary; but we think it not applicable to a homicide in the commission of a burglary. It would be strange indeed if this court were to hold, in a case where a burglar has made his entry, is packing up his loot, is challenged by the master of the house and shoots and kills him, that the statutory first degree rule does not apply because the "burglary" is complete. As to this, the New York Court of Appeals said in *Dolan* v. *People,* 64 *N. Y.* 485 (at *p.* 497), "if a burglar break into a dwelling house burglariously, with the intent to steal, the offense is doubtless complete before he leaves the building, but he may be said to be engaged in the commission of the crime until he leaves the building with his plunder; and if while there engaged in securing his plunder, or in any of the acts immediately connected with the crime, he kills any one resisting him, he is guilty of murder under the statute." The rule stated in the text of 29 *C. J.* 1107, and which for present purposes we approve, goes somewhat farther, saying: "a murder may be committed in the perpetration of a felony, although it does not take place until after the felony itself has been technically completed, if the homicide is committed within the *res gestæ* of the felony." This seems to be the rule applied, if not stated in this language, in our cases above cited, and indeed conceded by counsel for defendant in moving for a directed acquittal when the state's evidence was in. The concession was limited to a situation involving grand larceny at common law, but we have already dealt with that matter. Applying it to the case at bar, we think that the jury were clearly entitled to find that the child was killed while the "burglar" was still on the Lindbergh premises; and, if so, the homicide would be murder in the first degree under section 106 and 107, *supra.*

Point IX is a further discussion of the case of *State* v.

*Jones,* 115 *N. J. L.* 257, already mentioned. We have already said, and repeat, that the alternative theory of homicide suggested in the summing up by the attorney-general was not adopted by the court, nor submitted to the jury. Consequently this point is without substance.

Point X is argued at considerable length, the discussion taking up some twenty pages of the printed brief. The heading of this point reads as follows:

"The court by its charge impaired a free verdict and impressed upon the jury his conclusions as to the evidence and imposed upon the defendant an unauthorized rule as to reasonable doubt."

Again the point consists of two legally distinct propositions: The first is the alleged erroneous comment on the testimony; and the second the alleged misstatement of the reasonable doubt rule.

Taking up the first: The discussion relates more particularly to the judicial comment on the Condon testimony, the circumstantial evidence, the note said to have been found on the window sill, the material of which the ladder was constructed, the ransom money and the story about Fisch, the testimony relating to the thumb guard, the evidence of alibi, and the testimony of the old witness named Hochmuth. Counsel sum up the criticism on the first branch of Point X by saying:

"These remarks and charge of the court on the question of the circumstantial evidence controvert and upset every legal postulate hitherto embedded in our system of criminal jurisprudence."

The brief under this point ignores one of the most thoroughly settled rules in our New Jersey criminal jurisprudence. That rule is that "it is always the right and often the duty of a trial judge to comment on the evidence, and give the jury his impressions of its weight and value, and such comment is not assignable for error so long as the ultimate decision on disputed facts is plainly left to the jury." *State* v. *Overton,* 85 *N. J. L.* 287.

The writer of the brief appears to take the stand that was taken by counsel for the plaintiff in error in the Overton case,

viz., that "a trial judge should not intimate any opinion upon the facts."

In a still later case of *State* v. *Corrado,* 113 *N. J. L.* 53 (at *p.* 59), the opinion speaks of "certain comments of the trial judge on the evidence, interrogative and argumentative in character, as calculated to influence the jury unfavorably to the defendant. These comments were in no way erroneous. The right of the trial judge to give the jury the benefit of his individual view of the evidence, so long as he is careful to avoid controlling them by a binding instruction, is settled in the state beyond peradventure."

The rule has obtained in full force for many years.

In *Donnelly* v. *State,* 26 *N. J. L.* 463 (affirmed at *p.* 601), two assignments of error alleging that the court by its charge invaded the province of the jury by arguing the facts of the case, and also that the court in said charge did give a partial view of the evidence against the prisoner, and omitted the circumstances in his favor, were held not to constitute a legal ground of error, or of a bill of exceptions.

In *Bruch* v. *Carter,* 32 *N. J. L.* 554, a civil case, this court held (at *p.* 565), that "a judge has an undoubted right to make such comments upon the testimony as he thinks necessary or proper for the direction of the jury." There are further remarks on the point unnecessary to reproduce here, but all of the same purport.

In *Castner* v. *Sliker,* 33 *N. J. L.* 507, also in this court, the then Chancellor Zabriskie, in commenting on certain rather strong language in the charge which is quoted at page 511, pointed out that the ultimate finding of facts was left with the jury, and concluded: "It is the right and duty of a judge to comment upon the evidence, and in cases where he thinks it required for the promotion of justice, to give his views upon the weight of it, provided he leaves it to them to decide, upon their own views of it. This is too well settled by repeated decisions, to be now called in question."

In the case of *Smith and Bennett* v. *State,* 41 *N. J. L.* 370, the comments of the trial judge were held erroneous on the specific ground (page 381) that there was no foundation whatever in the testimony for a certain stated assumption

of facts; but on page 385 the late Chief Justice Beasley said: "It has already been said that it is competent for the judge presiding at a criminal trial to lay before the jury for their consideration his own views and inferences from the proofs, and that such expressions, no matter how ill advised or erroneous, can be reviewed on a motion for a new trial, but not on a writ of error; but the defect in this case is that a story is imputed to this defendant, and put in her lips, which she never uttered, and thus a fact, of the utmost importance, is, by unguarded expressions, imported into the testimony, and the introduction among the proofs of such foreign admixture must of necessity be held to constitute error in law."

Some later cases are *Engle* v. *State,* 50 *N. J. L.* 272; *State* v. *Simon,* 71 *Id.* 142, where the comments of the judge were conspicuously argumentative in character; and *State* v. *Hummer,* 73 *Id.* 714, where at page 719 the late Justice Garrison quoted from the opinion by Chancellor Zabriskie in *Castner* v. *Sliker, supra,* and added: "The notion that it is any part of our judicial system that the jury, whether in civil or *criminal* cases, must be kept in ignorance of the impression made by the testimony upon the mind of the trial judge, is absolutely devoid of foundation. What our judicial system does require is not that jurors should be kept in ignorance of the impression made by the testimony upon the mind of the judge, but that they should be informed that it is their right and duty to decide for themselves all disputed questions of fact according as the weight of the testimony appeals to them" (citing several of the above cases), and continuing:

"In view of these expositions of the law, it must be obvious that legal error cannot be based upon the comments in question, and that even under the broader scope of the proceedings before us they cannot be deemed to be an abuse of judicial discretion for which a reversal can be had."

The same ruling was made in the Supreme Court in *State* v. *Warady,* 77 *N. J. L.* 348, affirmed here on this point on the opinion of that court in 78 *Id.* 687.

A number of other cases are cited in the brief for the state, but we deem it unnecessary to multiply authorities on a point so conclusively settled. A careful examination of the charge

will show that this rule was never transgressed by the trial judge.

The whole charge shows signs of having been prepared with great care and without waste of words. It pointed out, and properly, features of the evidence which by the court were deemed important for their consideration in getting at the facts. He indicated in some cases his individual view, but in no case was that view so placed before the jury as to require them to consider themselves controlled by it. On the contrary, the court was careful at all times to reserve to them the ultimate decision on matters of fact.

The second branch of Point X we deem equally without merit. Two paragraphs in the charge are quoted in the brief. On the question of circumstantial evidence the writer of the brief insists "that the criterion of the proof engendered by circumstantial evidence violates the fundamental law of this state and upsets each legal postulate hitherto imbedded in our system of criminal jurisprudence. It is destructive of the definition of reasonable doubt and it imposed upon the defendant the burden of practically establishing his innocence to the satisfaction of the jury."

All that we can say in reply to this is that the criticism appears to be utterly and absolutely unwarranted; and that the omission of the connected passages of the charge on the subject of circumstantial evidence and of reasonable doubt has caused some confusion which will readily be cleared up by reading this portion of the charge as a whole. It seems unnecessary to say anything further on this point.

Point XI is based upon language of the charge on the subject of expert evidence respecting the handwriting of letters claimed to have been written by defendant. The language of the charge is as follows:

"A very important question in the case is, did the defendant, Hauptmann, write the original ransom note found on the window sill, and the other ransom notes which followed? Numerous experts in handwriting have testified, after exhaustive examination of the ransom letters, and comparison with genuine writings of the defendant, that the defendant, Hauptmann, wrote every one of the ransom notes, and Mr. Osborne,

Senior, said that that conclusion was irresistible, unanswerable and overwhelming. On the other hand, the defendant denies that he wrote them, and a handwriting expert, called by him, so testified. And so the fact becomes one for your determination. The weight of the evidence to prove the genuineness of handwriting is wholly for the jury." The sentence beginning "numerous experts" and ending with "overwhelming" is selected for specific attack, which seems to consist of the proposition that the court "unduly and erroneously emphasized the value and effect of handwriting testimony by referring to and quoting from the testimony of the elder Mr. Osborn" (here follows the sentence in question). We fail to see in this anything but legitimate comment. Further, under the same point, the refusal to charge requests Nos. 1, 2 and 3 is urged for error. They are as follows:

"1. All doubts respecting the competency of the opinion of experts in handwriting, based upon mere comparison, as evidence, have been removed by the statute. (*Rev.* 381, § 19) : but it must be esteemed proof of low degree. Very learned judges have characterized it as much too uncertain, even when only slightly opposed, to be the foundation of a judicial decision. *Gurney* v. *Langlands, 5 Barn. & Ald.* 185; *Doe* v. *Suckermore, 5 Ad. & El.* 751; 1 *Greenl. Ev.,* § 80, note (2) ; *Stark. Ev.* 173, note (c). 30 *Equity* 201. *Mutual Benefit Life Insurance Co.* v. *Brown.*

"2. It has been said by an eminent law writer with respect to the evidence of handwriting experts that this kind of evidence is most unsatisfactory, very inconclusive, most unreliable and of the lowest probative force. *Moore on Facts,* § 615.

"3. A jury is not bound to accept the opinion of an expert as to disputed handwriting, even when uncontradicted. It should consider it as an argument rather than as proof, and to make allowances for all the disturbing influences by which the judgment of the expert may be moved. 1 *Whart. Ev.,* § 722."

These are copied *verbatim* in order to make it plain that Nos. 2 and 3 are extracted from legal text books, and No. 1

from an opinion by the late Vice-Chancellor Van Fleet in 1878.

The refusal of No. 2 is clearly supportable on the ground that it does not pretend to be a direct proposition of law, but merely a quotation from a text writer. No. 3 we think was adequately covered, if correct, by the broad instruction leaving the weight of evidence on handwriting to the jury. Request No. 1 is taken, as we have said, from the case of *Mutual Benefit Life Insurance Co.* v. *Brown,* 30 *N. J. Eq.* 201. As to this, it should be noted in the first place that the case came to this court (32 *Id.* 809) which did not adopt the language of the vice-chancellor, but went no farther than to say (page 812), "the opinions of experts, however skillful they may be, are weaker in degree of certainty than the direct evidence of the subscribing witness, who has sworn to the genuineness of both signatures, when he proved the execution. There is nothing in the evidence to show that he had any interest or motive to swear falsely, or to impugn his veracity." This is very far from saying that the expert evidence is, generally and without qualification, "proof of low degree." In this case, as the trial judge pointed out, numerous experts in handwriting had testified that the defendant wrote every one of the ransom notes, and only one for the defendant denied this. The history of the legitimizing of this class of evidence, *i. e.,* comparison of handwriting, is most interesting, but cannot be considered *in extenso* here. See *Wigm. Ev.,* §§ 1991 *et seq.* But it may well be noted, that its legal status was at least very doubtful until it was authorized by statute; in England in 1854, and in this state for the first time, apparently, in the Revision of 1874. See *Rev.* 1877, *p.* 381, § 19; *Comp. Stat., p.* 2226, § 20. In *Gordon's Case,* 50 *N. J. Eq.* 397, Chancellor McGill, sitting as Ordinary, said (at *p.* 422) : "Handwriting is an art concerning which correctness of opinion is susceptible of demonstration, and I am fully convinced that the value of the opinion of every handwriting expert as evidence must depend upon the clearness with which the expert demonstrates its correctness. * * * (page 423). Without such demonstration the opinion of an expert in handwriting is a low

order of testimony," &c. Neither of the two statements is binding on this court. There was no request to charge the latter; and as to the former, which was requested, we are at least clear that without the qualifying clause of demonstration, the defendant was not entitled to have it charged. There was in fact ample demonstration by the experts for the state; and plainly it was satisfactory to the jury, to whose decision the judge properly left it. 22 *C. J.* 728; *Com.* v. *Williams,* 105 *Mass.* 62, 68. We find no error in the refusal of the first request.

Point XII also brings up refusals to charge, and is in several subdivisions. The first deals with the charge on reasonable doubt. It was fully and correctly charged. The present complaint is that the court did not add a sentence contained in the opinion of the Supreme Court in *State* v. *Hadley,* 113 *N. J. L.* 335, 337. The trial court in that case had charged that "if the state has failed to prove its charges, *and* the defendants have caused you to entertain and believe that such a doubt actually exists," &c. The Supreme Court naturally and properly said: "The duty was upon the state to prove the defendants guilty beyond a reasonable doubt, and no duty was cast upon the defendants to cause the jury to entertain a doubt as to their guilt." But that was applicable and applied to that particular situation, and the court was very far from holding that any proper charge on reasonable doubt must include the latter phrase. The accredited formula was used in this case and no such addition was called for.

As to venue. There were six requests said to have been refused.

No. 1. No evidence that the murder was committed in Hunterdon. This is not supported by the record.

No. 2. Presumption of death in Mercer. This was charged.

No. 3. That the presumption was not rebutted. That question was for the jury.

No. 4. No evidence of a felonious striking in Hunterdon. There was such evidence.

No. 6. No evidence of completed murder in Hunterdon. This was not required, in view of section 59 of the Criminal Procedure act, *supra.*

No. 10. If death occurred in Mercer and it ensued from commission of burglary in Hunterdon, acquit. This was properly refused as death in Mercer could have ensued from a felonious striking in Hunterdon.

No. 8. "No evidence that defendant committed or attempted to commit burglary," &c. There *was* evidence, as already pointed out.

No. 5. No evidence of premeditated murder, and (15) no evidence of murder in *any* degree. The brief says on this point:

"The argument as to the necessity of charging these requests is that since there was no proof of the commission of the crime of burglary, the only remaining proposition for the consideration of the jury was whether or not a murder had been committed other than one ensuing from the commission of a felony. In such a situation it was of course important that the degree of murder be charged under this indictment."

The answer is that by the statute in this state (*Comp. Stat.,* p. 1832, § 36) there is no need to specify degrees in murder indictments. The argument fails with the statement of its object.

No. 19, presumption of good character. Request: "A presumption of good character always exists as to the defendant and may of itself be sufficient to raise a reasonable doubt as to the defendant's guilt."

No authority is cited for this request, and we know of none. Good character is not an issue until defendant makes it such. He may give proof of good character, subject to rebuttal by the state. The state may not in the first instance give proof of bad character; but in any event, the bad character of defendant was fully proven by his own testimony on cross-examination. We see no error in the refusal to charge this request.

No. 22. The request was that "if there is in the mind of any juror a reasonable doubt of the defendant's guilt, fairly arising from the evidence in the case, the juror has no right to consent to a verdict of guilty in deference to or from

respect to the other jurors' belief or opinion. Such juror must stand by and abide by his own belief formed in his own mind from the whole of the evidence in the case in which he believes, including the testimony of the defendant."

This was properly refused, as it seems to foreclose any persuasion of a juror by his fellows. The jury are sent out for the very purpose of reaching an agreement; and an individual juror may well conclude that he must be in error when he finds eleven against him. The request was covered by the instruction, "I am requested to charge and do charge that each juror must reach his own judgment after discussion of the facts with his fellow jurors."

No. 24. Request that from any number of theories of guilt and only one of innocence, the jury should adopt the latter theory.

Our reading of the colloquy between court and counsel indicates that any exception prayed was withdrawn. No exception being sealed, it fails as such. It is not contained in the causes for reversal. Moreover, it was fully charged in effect so far as concerned circumstantial evidence.

Point XIII. The exclusion of the Tartell testimony. The situation was this: A Mrs. Barr, cashier of a movie theatre, testified that on November 26th, 1933, Hauptmann bought a forty-cent ticket and paid with a $5 bill folded three times so as to make eight sections. It was banked by the theatre people with other money and the next day, November 27th, she had a visit from a Lieutenant Finn of the police, who had the bill with him. She was tested on cross as to identification, but nothing was said about Tartell by name or otherwise, and Mrs. Barr was dismissed. Later, Tartell was called to testify that he was a patron of the theatre, and that she had failed to recognize *him* notwithstanding some controversy about wrong change, or the like. We think that this was wholly irrelevant and properly excluded. Not only had the witness been asked nothing about Tartell, but there was no suggestion of her attention being called to him by such an incident as a trebly folded bill which turned up next day in the hands of the police.

Point XIV. Refusal to strike out testimony of Kelly and Maish. The proposition is that both were allowed to testify as experts and neither was qualified.

Kelly, a state trooper, sworn, said he specialized in identification. Had examined the ladder for finger and other marks; that he placed it against the house in three sections but found no marks where the top rested; that he tried again with two sections and found markings the width of the ladder and one and one-half to two inches above the end when set in the mudholes; the marks were "right with the ladder. *Q*. What kind of marks were they? *A*. Ladder marks." Mr. Reilly moved to strike this answer out *as a conclusion*. The motion was denied and exception taken. The witness went on to testify that the marks were very plain—a scraping mark in the white paint—the gray of the stone showed through; also that there were white marks on the top ends of the ladder—"I would say paint."

The objection was to a conclusion. It was not that Kelly had not been qualified as an expert. Assuming the technical impropriety of the statement that they were "ladder marks," the other testimony put the jury in a position to form their own conclusion, and they had the ladder in evidence.

As to Maish. He had made the baby's thumb guard and said it would not rust. On cross, his authority as an expert was seriously impaired; but the testimony was in and was completed; the witness was dismissed, certain exhibits were marked, the court adjourned for the day and reconvened next morning after Maish had presumably gone home to Wyoming, Ohio, and then counsel for the first time moved to strike the testimony out. The court denied the motion on the merits. It is sufficient to say that it came too late. Moreover, the motion made the next day was to strike out the Maish testimony *in toto*. Part of it was clearly competent; and for that reason also the motion was properly denied.

Point XV, is that the ladder was improperly admitted in evidence. The ladder was found near the Lindbergh house on the night of the crime by Bornmann, a member of the state police. He turned it over to Kelly on the spot. It was in the possession of Kelly, or Lamb, or Koehler from that

time forward. Lamb was an officer in the state police. Kelly was a trooper and was particularly delegated to the care of that ladder, especially while it was in Washington, where he saw it put in a safe every night and taken out every morning. Koehler was the government expert. Slight changes were made, as that for some reason a new piece was affixed and perhaps some nails were not the same, the ladder having been taken apart for the purposes of examination. But the ladder was substantially the same as when it was found, and so testified by Kelly and by Bornmann. All of the changes that had been made were described and had been accounted for. As an exhibit, the ladder was sufficiently identified, and its history was sufficiently shown to justify its admission. The claim that it was not brought home to the defendant is without substance.

Point XVI. That the verdict was against the weight of evidence.

Defendant's argument on this point deals principally with the alleged lack of credible evidence tending to show his presence at the scene of the crime on the day of the kidnapping or at any other time.

It is maintained that the testimony of Rossiter, Whitted and Hochmuth on this crucial issue was either willfully false or the product of morbid or irresponsible minds; and that the trial judge laid undue stress thereon to the great prejudice of defendant; that not a single readable fingerprint was found in the nursery room or on any of the equipment therein, or on the ladder, the chisel or any of the ransom notes; that, on the contrary, Dr. Hudson, defendant's expert, found fingerprints but none of defendant's; that the handwriting evidence was unreliable; that the testimony of the wood expert, Koehler, was likewise unworthy of credit in the determination of an issue so grave; that Colonel Lindbergh's identification of the defendant by his voice was entitled to little weight; that the evidence of the payment of the ransom, and its possession by defendant, bore only upon the crime of extortion, and that, in any event, the evidence that $2,790 of the ransom money was deposited in the Federal Reserve Bank at the time the gold notes were called by one "J. J. Faulkner,"

whose handwriting on the deposit slip was concededly not that of Hauptmann, was a most persuasive circumstance; and that the testimony of Condon and the remaining witnesses was on the whole of such a character, in its material aspects, as not to furnish adequate ground for a verdict of guilty.

Defendant's reply brief points out that the evidence of Mrs. Lindbergh established that "friendly hands" lifted the child from the crib; that "the safety pins still held the covers to the mattress," and that "there was no bloodstains or evidence of haste, anywhere." The query is put, "how did the kidnapper know that the southeast window led into the nursery or that it was the only window in the room that could not be locked?" And it is said that, with a thirty-five-mile gale blowing, the defendant did the highly improbable thing of "risking his life" on this frail ladder, and of placing "it against the side of the house without leaving his trail imprinted in the soft earth, climbed the ladder to next to the top rung forty-eight inches below the window sill, and with his left hand opened the shutters in a thirty-five-mile gale, raised the window without the use of a jimmy or instrument, entered the room alone and obtained the baby." Attention is directed to the absence of evidence of an "outcry or alarm" when the baby was lifted from the crib and carried out the window, as alleged, and the fact that a stein resting on the side of the window sill was not disturbed; that the gale did not disturb the note left by the kidnapper; that the closed window and shutters found after the kidnapping demonstrated that "it did not happen that way; that the window was never opened or closed; that the baby never came out of the window and certainly could not have met its death under that window or in the room without leaving some indication somewhere showing where its skull was fractured."

Moreover, it is claimed that there was affirmative credible evidence of an alibi both as regards the night of the commission of the crime and the payment of the ransom money.

Our conclusion is that the verdict is not only not contrary to the weight of the evidence, but one to which the evidence inescapably led. And discarding the testimony of the witness classified as irresponsible by the defendant, the result is

the same. From three different and, in the main, unrelated, sources the proofs point unerringly to guilt, viz., (a) possession and use of the ransom money; (b) the handwriting of the ransom notes; and (c) the wood used in the construction of the ladder.

(a) Bills totalling $14,600 were found hidden in defendant's home in the Bronx, New York, beneath the floor of the garage, and in the rafters of the dwelling house. In a hidden recess in one of the rafters containing some of the bills was found a small revolver. On a board in a closet of the house was found, in defendant's handwriting, the address and telephone number of Condon. And we have the return of the sleeping suit by the man to whom the ransom money was eventually paid.

The explanation of the source of this money offered by defendant was incredible, and we find not the slightest evidence to corroborate it. The defendant's handling of the money makes clear his guilty connection with the enterprise. He was without funds before the payment of the ransom money, and in comparative poverty; he worked at his trade apparently, in the light of his subsequent conduct, because it was his only means of livelihood. After the payment of the money, he refrained from work entirely and speculated in Wall Street on a comparatively large scale. His actions thereafter are persuasive of guilt. It is clear his new found prosperity was evidenced long before he says he found the money claimed to have been left by Fisch. It is inconceivable that Fisch, if he had this money, would have left it in defendant's custody in the manner claimed, particularly when he was planning to leave for Germany on what seemed to be his last trip. He was afflicted with tuberculosis and died shortly after returning to his homeland.

From the foregoing it is deducible, to a moral certainty beyond a reasonable doubt, that he collected the ransom money, and was therefore the kidnapper, particularly in view of—

(b) the identification of the handwriting on all the ransom notes, including the one left on the window sill of the nursery window, as that of Hauptmann. The peculiarities of

expression and spelling common to all these notes and admittedly genuine writings by Hauptmann. It is likewise an inescapable inference that the writer of the ransom note on the window sill entered the nursery and perpetrated the crime.

Moreover, we have the chisel found at the scene of the crime. It was of a size that is ordinarily a part of a carpenter's tool chest, but was missing from Hauptmann's set found in the Bronx home.

(c) Part of the wood used in the construction of the ladder was taken from Hauptmann's Bronx home. It is significant that long before Hauptmann's arrest, the wood, or part of it, was traced to a Bronx lumber yard near his home by the expert Koehler. And there was evidence that Hauptmann limped for some days after the kidnapping.

It is clear the ladder was used to reach the second story. Colonel Lindbergh heard the sound of breaking wood that evening, and the ladder was found broken. The witness Sweeny, by actual test, demonstrated that the entry of the second story window and the descent therefrom with the child could be accomplished with the ladder.

There is no significance in the selection by the kidnapper of the unlocked southeast window. The shutters, because of warping, could not be completely closed, and it is fair to assume that the intruder selected this unlocked window by pure chance, or when he found the other windows barred.

And the claim that entry was not made through this window had nothing to support it. Muddy footmarks were found on the window sill and nursery floor, and a suitcase placed on the floor under the window. Footprints were found outside the window.

The absence of defendant's fingerprints had no significance; it is clear that this self-confessed and apparently experienced criminal would naturally guard against the making of these tell-tale marks of his visit.

There was much more evidence tending to establish his guilt. It was a circumstantial case with the evidence pointing to guilt from so many directions as to leave no room for a reasonable doubt.

But apart from this, for purposes of review, the element of reasonable doubt is out of the case. The question now is, not whether there was reasonable doubt, but whether, in the language of the statute (*Pamph. L.* 1921, *p.* 951) the verdict was against the weight of evidence. On that issue the test is whether it is so clearly against the weight of evidence as to give rise to the inference that it is result of mistake, passion, prejudice or partiality. *State* v. *Karpowitz,* 98 *N. J. L.* 546; *State* v. *Mosley,* 102 *Id.* 94, 97; *State* v. *Von Der Linden,* 105 *Id.* 618; *State* v. *Treficanto,* 106 *Id.* 344, 350. We consider that the weight of evidence was with the state.

There was an application to this court by defendant for a *certiorari* based partly on allegation of diminution of the record, and partly on matters *dehors* the record. This was in ten subdivisions indicated as A to J inclusive. A, B and C asked for the opening by the attorney-general, the opening by the prosecutor to the jury at the end of the evidence, and the final summing up by the attorney-general. All these were printed and submitted, and have been duly considered.

As to the other matters this court in its discretion refused a *certiorari,* with rule to take depositions in support of them. They are as follows:

D (1) The daily presence in court of the father of the dead child. This fully appears *passim* in the record, and Mr. Reilly in the course of his summing up addressed Colonel Lindbergh by name. He was a witness for the state, and liable to be recalled at any time. At no stage of the proceedings was it suggested that his presence was detrimental to the defendant.

(2) The daily presence of "other prominent persons not connected with the case, and their close proximity to the jury," &c. No names are mentioned, and there is no suggestion of any action by the anonymous "prominent persons." Such a vague claim merited no recognition, particularly as it is elementary that the proceedings must be public.

(E) "The repeated outbursts of spectators in the court room during sessions."

That such outbursts should occur is not unusual at the trial of a case of great public interest, and in a crowded

court room. There is again no suggestion that suitable measures to control it were not taken by the court. The printed book shows that they were taken; and that for some at least of the outbursts defendant's counsel were responsible; not to mention defendant himself.

(F) Confusion and disorder "reigning" in the court room, viz., running about of messenger boys and clerks employed by the press.

Without doubt there were messengers going to and fro. Again, it was inevitable. The press and public were entitled to reports of the daily happenings, and it was quite proper for the trial judge to afford reasonable facilities for sending such reports. During the trial, the court seems to have taken proper action of its own motion to preserve order, and to have responded properly to any suggestions in that regard. No motion for mistrial or for a new trial on this or any other ground is claimed to have been made.

Under paragraph F is repeated the allegation of "frequent exhibitions of approval and censure or applause at the testimony of various witnesses." This has already been discussed under (E).

(G) Stories carried in the press and radio broadcasts before the trial and "conveyed to the general jury panel." If the result of an important murder trial is to be nullified by newspaper stories and radio broadcasts, few convictions would stand. In *State* v. *Overton,* 85 *N. J. L.* 287, already cited on another point, we said, on the denial of a motion to adjourn the trial because of a newspaper report: "Of course, a court cannot be put in error by the mere publishing of newspaper reports. While it may be that in cases of public excitement the possible effect of newspaper articles upon the jury may justify the court in its discretion in adjourning a trial and summoning another jury, it has never in this state been a ground of challenge to a juror that he had read newspaper reports relating to the case, so long as he declares his ability to consider the case on the evidence." In that case there was a motion for a continuance before the trial really began. In this, counsel go through the trial to the end without a suggestion of any such motion, and make it after con-

viction, sentence, and writ of error. In the Corrado case, 113 *N. J. L.* (at *p.* 61), already cited, there was an uproar in the court, an assault, and a fainting spell. The trial went on without objection to verdict and sentence. Three weeks after sentence the defendant asked a new trial which was refused, and we held there was no abuse of discretion "particularly as defendant was apparently willing to proceed with the trial at the time and take his chances of a verdict." We see no merit here on the face of things.

(II) Failure to sequester the jury. The petition contains certain specifications as to how the jury were handled by the officers, where they were lodged and fed during the trial, and how they were obliged to thread their way through a crowd at times. But it appears that they were constantly kept together, were attended by four constables, that they lodged on the third floor of the local hotel and exercised on the porch of the second floor. The hotel is opposite the court house and entertained the public generally including reporters. The jury took their meals in the main dining room behind screens at the farthest point from the entrance door. There are other allegations which will not be reproduced, as they are of the same general character. Assuming the truth of all of them, the answer is again, that there is nothing to show any complaint to the court at any time; and apart from that, the law does not require that jurors be so isolated that they are out of all sight and hearing. The necessary inference from the petition is that such isolation should have been effected, in some way not clearly pointed out.

But it is sufficient to cite the case of *State* v. *Cucuel,* 31 *N. J. L.* 249, as defining clearly the rules to be followed in such case.

(I) Supplying meat and drink to the jury after they were sent out. This seems universal in modern practice (16 *C. J.* 1073) by permission of the court, which was presumably obtained, as it usually is.

(J) (1) Use of magnifying glass by the jury. We see no more objection to this than to the use of eyeglasses by an individual juror.

(2) That the jury "were advised that if a verdict was not

rendered by a certain hour in the evening, the presiding judge would leave the court house and they would not be able to render a verdict until the following morning under any circumstances." We quote the language of the petition. We can see nothing in this prejudicial either to the defendant or to the state. The petition does not intimate who told them; presumably it was the judge himself. If so, it was simply for their information, and so far as appears, without the slightest intimation that they ought to find one way or the other, or indeed at all. Everyone concerned in the trial, and particularly the jury, knew from frequent colloquies during the protracted trial, that the judge lived at Trenton between twenty and twenty-five miles away; that he came to Flemington each morning, and returned each afternoon after adjournment of court. At the termination of the charge the constables were sworn at eleven-fourteen A. M.; and the jury retired to consider their verdict at eleven-twenty-three A. M. There is nothing in the petition to show what the "certain hour in the evening" was, nor at what hour the jury were "advised" as claimed. It is suggested that this amounted to coercion; but we can see no coercion. Taking the statements in the petition at face value, the incident is precisely similar to what occurred in *Berry* v. *People,* 1 *N. Y. Crim. Reports* 43; in fact, the language used by the judge in that case was even stronger; and the Court of Appeals held that it "could not be construed as a threat of imprisonment or punishment." 77 *N. Y.* 588. The facts are fully recited in the later case of *People* v. *Sheldon,* 156 *N. Y.* 268 (at *p.* 282). The court there said: "The decision of the court, therefore, was that there had been no attempt at coercion, the language complained of not being susceptible of a construction that would give it that effect to the jury." In that case of People *v.* Sheldon, the court was distinguishing between Berry *v.* People and the case then before it for decision.

But the complete and final answer to these allegations of the petition is that they come too late, several months after the trial, and when the case is under review on writ of error.

The judgment of conviction is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, HETFIELD, DEAR, WELLS, JJ. 13.

*For reversal*—None.