UNITED STATES of America,
Plaintiff,

v.

John A. NAPLES, Defendant.

Crim. No. 91–59.

United States District Court
District of Columbia.

March 9, 1961.

24

Oliver Gasch, U. S. Atty., and Frederick G. Smithson, Asst. U. S. Atty. for Dist. of Columbia, Washington, D. C., for plaintiff.

Charles B. Murray and Richard M. Coleman, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

The defendant, John A. Naples, is on trial for murder in the first degree, housebreaking and petit larceny. The specific charges are that on the evening of December 16, 1958, the defendant broke and entered into an apartment at 225 Massachusetts Avenue, N. E., in Washington, D. C.; that he ransacked it in search for money; that, as he was about to leave, he was surprised by the return of the occupant, Edna G. Jewel, the deceased; that he fatally stabbed her, and then stole some money out of her pocketbook.

The indictment contains four counts. The first count charges murder in the perpetration of a housebreaking while armed with and using a dangerous weapon, which under the District of Columbia Code constitutes murder in the first degree. The second count involves premeditated murder, which is likewise murder in the first degree. The third count is directed to housebreaking.[1] The fourth count alleges petit larceny.

The pertinent parts of the definition of murder in the first degree in the District of Columbia Code, read as follows (D.C.Code 1951 Ed. Section 22–2401):

"Whoever, being of sound memory and discretion kills another purposely, * * * of deliberate and premeditated malice * * *, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, * * * rape, mayhem, robbery, or kidnapping, or *in perpetrating or in attempting to perpetrate any housebreaking while armed with or using a dangerous weapon*, is guilty of murder in the first degree." (Emphasis supplied.)

The defense takes a twofold position: first, it seeks to put the Government to

1. Under the District of Columbia Code, both common law burglary and house-breaking are known as housebreaking, D.C.Code 1951 Ed., Section 22–1801.

its proof to establish the commission of the crimes by the defendant beyond a reasonable doubt; and, second, it interposes the issue of insanity. The defendant has been ably and zealously represented by counsel appointed by the Court, Mr. Charles B. Murray, a well known member of the bar with many years' experience in the trial of important causes, and chief of the Legal Aid Agency.

By advice of counsel, the defendant waived a trial by jury. While in this court the accused frequently elect to be tried by the court without a jury, this course is not ordinarily followed if murder in the first degree is charged, since in that event under the District of Columbia Code the death penalty is mandatory in case of conviction. Mr. Murray very candidly and cogently explained, however, that he had reached the conclusion that the rights of the defendant would be better protected by a trial by the court alone, than by a jury trial. His reasons need not be discussed here. As a further precaution, the court searchingly interrogated the defendant in person in order to make certain that he understood his right to a jury trial; that he deliberately desired and preferred a trial by the court alone; and that he fully comprehended the consequences that might follow from his choice. In the light of these circumstances and in view of the importance of the matter to the defendant, the court felt morally obligated to accept the onerous burden of trying this case without a jury.[2]

The evidence introduced at the trial establishes the following facts. The deceased occupied an apartment located on the first floor back of the stairway, in an apartment house at 225 Massachusetts Avenue, Northeast, in Washington, D. C. Shortly after 10:00 p. m., on December 16, 1958, her dead body was discovered by a neighbor and the resident manager of the building, lying on the floor of her apartment immediately inside the front door. An autopsy showed that death had been caused by two stab wounds: one in the neck, penetrating the trachea and the internal jugular vein; and the other in the chest. In addition the corpse bore several superficial scratches. Shortly after 1:00 o'clock of the following afternoon, the defendant, John A. Naples, was arrested and promptly made a full confession.

The events of the fateful evening were as follows. On December 16, 1958, the defendant, John A. Naples, was staying with his mother and twin brother, Louis, at their mother's apartment at 227 Massachusetts Avenue, Northeast. That evening he decided to steal some money. After packing a bayonet in a canvas overnight bag, he put on his gloves, later explaining that he did so in order to avoid leaving fingerprints. Carrying the bag in one hand, he went out seeking a place where he could accomplish his purpose. He first went next door, to 225 Massachusetts Avenue, Northeast. He looked around on the ground floor and saw that the door of the apartment located back of the stairway was slightly ajar and that lights were burning inside. He approached the entrance and in order to ascertain whether anyone was present, he said something in a loud voice. Hearing no response, he assumed that the occupants were absent and went in. He ransacked the closets and the bureau drawers in search for money, and found three or four dollars in currency and some coins, which he took. Leaving the place in disarray, he was about to depart, when the deceased, a heavy woman of about fifty years of age, returned home. She shouted at him: "What are you doing here? Get out! Get out!", and threw her pocketbook at him. Apparently observing that she was blocking his

---

2. It may be interesting to note that in the neighboring city of Baltimore, Maryland, over ninety-eight percent of all criminal cases tried in the State courts, are tried without a jury, as for many years a local custom has existed to waive jury trials in criminal cases. In capital cases, however, the judge frequently associates with himself one or more other judges so that the trial is conducted by two or three judges.

exit and becoming panic-stricken and enraged, he took the bayonet out of his bag, rushed at her, and stabbed her several times. As already stated, two of the stab wounds, one in the neck and one in the chest, were deep and proved fatal. Seeing blood spurting from her, and noticing that there was blood on his gloves, he decided to burn them. He deliberately took them off, laid them on the burners of the stove and ignited the gas. He put the bayonet back in the bag. He rifled his victim's pocketbook and took a ten dollar bill and some other money, throwing the empty wallet on a couch. He then extinguished the fire. By that time the burning process had progressed so far that when later the police tried to lift the gloves from the stove, they immediately turned to ashes.

Finally the defendant departed and proceeded to Union Station, where he washed himself for the purpose of removing blood stains and ate some food at a lunch counter. There he also met his mother and brother. Instead of going home with them he spent the night at the Y. M. C. A. He checked out on the following morning and, in order to meet his brother, went to the Palace Theater, where the latter was employed.

He arrived at the theater shortly after 1:00 o'clock in the afternoon and was immediately taken into custody by police officers who were looking for him. At the time of his arrest the defendant was carrying the canvas bag containing the bayonet. An examination later conducted at the laboratory of the Federal Bureau of Investigation disclosed that there were stains of human blood on the bayonet, although the amount of blood found was insufficient to make it possible to determine its type.

In view of the gravity of the issues presented at the trial, the court has reviewed its adverse rulings on objections to the admission of certain items of evidence and reference will be made to these matters at this time. Counsel for the defendant objected to the introduction of the canvas bag and the bayonet, asserting that they had been unlawfully seized from the defendant's person. He contended that the defendant's arrest was illegal in that it had been made without a warrant and without probable cause and that, therefore, the seizure was violative of his rights under the Fourth Amendment.

Accordingly the court held a preliminary hearing on the question whether there was probable cause for the arrest. On this issue the Government called as a witness Detective Buch, one of the many police officers who were working on the case. He testified that on the morning of December 17, he received an anonymous telephone call. The caller stated that he thought he had some information in regard to the murder that occurred at 225 Massachusetts Avenue on the previous night, and that he had a friend who might be involved in it. He enquired whether a knife had been used, and received an affirmative reply from Buch. Refusing to reveal his identity, the caller stated that he would telephone again. About a half hour later, the same person called and stated that he had a friend to whom he had talked on the previous night; that this person was known to carry a knife; and that he, the caller, thought this person was involved in the homicide. The caller suggested that the officer meet him at the Palace Theater, and instructed him to ask for Louis. Accompanied by a brother officer, Buch immediately proceeded to the Palace Theater and enquired for Louis. He was directed to a man whose name was Louis Naples, and whom the officer had previously known. Louis Naples then told the officer that it was his brother that he had referred to; that he had talked to his brother on the telephone the night before; that his brother said that he had done something awful and would not be home for some time; and that his brother carried a knife in an overnight bag. He then made a telephone call and returned and stated that his brother had spent the night at the Y. M. C. A. The officer telephoned the Y. M. C. A. and was informed that John Naples had checked out. Louis Naples finally told

the officer that his brother, John, was coming to the theater. The two officers unobtrusively waited and at about 1:15 p. m. John Naples arrived carrying the canvas bag and was taken into custody.

██ The court held that the information received by Officer Buch from Louis Naples, a part of which was verified by a telephone call to the Y. M. C. A., was sufficient to constitute probable cause for the defendant's arrest. This is not a topic that merits prolonged or detailed discussion. Suffice it to say that probable cause for an arrest need not amount to sufficient evidence to sustain a conviction, or to warrant an indictment, or even to justify a committing magistrate in holding the defendant for the grand jury. It need not be evidence that is admissible in court at a trial. It may be incompetent as hearsay or inadmissible for some other reason. It need be only such information as would warrant a reasonable man of prudence and caution in believing that the prisoner committed the offense for which he was being arrested. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879; Bell v. United States, 102 U.S. App.D.C. 383, 387, 254 F.2d 82, certiorari denied 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed. 2d 113; United States v. Heitner, 2 Cir., 149 F.2d 105, 106, Learned Hand, J.

In Goldsmith v. United States, 107 U.S. App.D.C. 305, 315, 277 F.2d 335, 345, the Court of Appeals for this Circuit clearly pointed out that,

"What may constitute probable cause for arrest does not necessarily constitute probable cause for a charge on arraignment."

██ In the case at bar the court is of the opinion that not only was there probable cause for the arrest, but that the officer would have even acted improvidently if he had failed to apprehend the defendant in the light of the information received from the defendant's brother.

The conclusion necessarily follows that the seizure of the overnight bag and its contents was lawful and that these articles were properly admitted in evidence. It must be added, however, that even if these articles had been excluded, the remaining evidence would have led to the same conclusion as that to which the court has otherwise arrived. Consequently the question here discussed is purely academic.

Upon his arrest the defendant was forthwith transported in a patrol wagon to the police station of Precinct No. 9, arriving there at about 1:30 p. m. He was immediately led upstairs to the detectives' room. A short conversation, lasting between five and ten minutes, then took place between him and Lieutenant Culpepper, the supervisor of detectives for that district. It opened with a statement by Lieutenant Culpepper that the defendant did not have to make a statement and that he did not even have to talk, to which the defendant replied, "I know that." The interview continued as follows:

"I asked him if he thought he would feel better if he told me the truth. He said, 'The truth about what?' I said, 'Haven't you done something that you know is wrong and that you are ashamed of?' He said, 'Do you mean about the lady?' I said, 'Yes'." (Tr. p. 110.) [3]

\* \* \* \* \*

"He said, 'Well, I was prowling in the hallway \* \* \* in the apartment next to my house' \* \* \* he said he lived at the 200 block of Massachusetts Avenue, Northeast. He said that he was looking around in the hallway for something to steal \* \* \* he saw the door to the apartment in the rear of the hallway was slightly ajar \* \* \* he went over to the door, stood there for a period of time, and realized that there was no one in the apartment. He said that had there been

3. All page references preceded by "Tr." are to the transcript of the reporter's record of the trial.

someone in the apartment they would have heard him. He said he went into the apartment and searched it, taking two dollars from a drawer in the small table in the living room. * * * He said he was searching the apartment and going into a closet, which he was going into when a lady came in. She screamed at him, 'What are you doing here?' She threw a book at him and said, 'Get out of here.'

"He said that at that time everything went dark. He did not remember anything until he came to. He saw the lady on the floor, there was a lot of blood about, and he knew that he had hurt her." (Tr. pp. 111, 112.)

During the conversation Lieutenant Culpepper communicated by telephone with the Homicide Squad of the Police Department and requested its representatives to come to the Police Station right away. While awaiting their appearance the defendant was taken downstairs and a charge against him was placed in the arrest book.

Captain Hartnett, the Chief of the Homicide Squad, arrived at Lieutenant Culpepper's office about 1:55 p. m. In the meantime the defendant had been brought back to the room. In the defendant's presence Lieutenant Culpepper briefly summarized to Captain Hartnett the statement previously made by the defendant. Captain Hartnett testified that, after he asked the defendant a few questions, the following took place (Tr. p. 147):

"I then told him that he was going to be brought down to Police Headquarters and that I would like for him to stop by the apartment on the way down so we could go through and let him show us exactly what transpired there, and he said he was willing to do it."

The entire conversation in which Captain Hartnett participated consumed five or ten minutes. The defendant was thereupon immediately taken by automobile, driven by Captain Hartnett, to 225 Massachusetts Avenue, Northeast, which was on the direct route from the police station to Police Headquarters. Other officers were also in the car. A cousin of the deceased happened to be in the building when the party arrived and Captain Hartnett invited him to be present.

The Assistant United States Attorney requested Captain Hartnett to state what the defendant did or said at the apartment house. Counsel for the defendant objected on the ground that the stop at the apartment house constituted an unnecessary delay prior to bringing the defendant before a committing magistrate and, consequently, any statements there made by the defendant were inadmissible. Counsel relied on the case of Mallory v. United States, 354 U.S. 449, 77 S. Ct. 1356, 1 L.Ed.2d 1479, which held that if there is an unnecessary delay prior to taking a prisoner before a committing magistrate, in violation of Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., any statement made by the defendant during the period of unnecessary delay is inadmissible in evidence.

■■ At this point it seems desirable to consider the purpose and the application of this rule. It drastically differs from the doctrine that excludes involuntary confessions, that is, statements obtained by coercion, whether that coercion be physical, mental, or moral. To obtain confessions in this manner is abhorrent to civilized standards of administering the criminal law. It is contrary to natural justice and is violative of due process of law. Moreover a statement secured by such means may be unreliable. Consequently, a constitutional principle is involved. On the other hand, the rule of the Mallory case is not based on any constitutional doctrine, but is purely artificial and procedural. It is intended solely as a severe sanction to prevent violations of Rule 5(a), which requires that an arrested person be brought before a committing magistrate with due promptness. Necessarily the rule must be reasonably construed and applied.

The Supreme Court so stated in the course of its opinion (354 U.S. at page 455, 77 S.Ct. at page 1359):

> "The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, * * *"

In this Circuit, the rule has been administered in this spirit.

Thus in United States v. Heideman, D. C., 21 F.R.D. 335, affirmed 104 U.S.App. D.C. 128, 259 F.2d 943, the defendant was brought to police headquarters at about 3:00 p. m. He made a confession at about 4:15 p. m. The admission of the confession in evidence over the objection of the defendant based on the Mallory case, was sustained by the Court of Appeals. In its opinion the court made the following significant remarks (104 U.S. App.2d at pages 130, 131, 259 F.2d at page 945):

> "At the outset, the police, assuming they have probable cause for arrest, are entitled to ask the arrested suspect what he knows about a crime. If he denies knowledge, they are entitled to state to him what evidence they have and ask whether he cares to comment upon it. A strong circumstantial case which would satisfy the U. S. Commissioner, prima facie, might well be explained away by a suspect who knew what information the police relied on—hence leading to no charge being made. If the suspect continues to deny knowledge, the police are entitled to conclude the interview by saying, in effect, 'Do you have anything further to tell us, or do you just want to let it stand the way it is?' * * * Such questions as these the police may ask—indeed *should* ask; it is only when the questioning crosses into what can be termed 'grilling,' or is continued beyond the brief period allowed, that

> the resulting confession may be held inadmissible."

In Goldsmith v. United States, 107 U. S.App.D.C. 305, 312, 277 F.2d 335, the defendants were brought to the police station at 1:00 p.m. and were intermittently examined until 3:30 p. m. At 3:35 p. m. they were confronted with a witness who had made accusatory statements against them and they immediately made an oral confession. Their statements were then reduced to writing. This process took a little over an hour. At about 5:00 p. m. they were taken to the Municipal Court and at 5:30 p. m. a preliminary hearing took place. The Court of Appeals indicated that the written statements made by the defendants were admissible in evidence, and were not subject to exclusion under the rule of the Mallory case. The court made the following illuminating observations (107 U. S.App.D.C. at page 313, 277 F.2d at page 343):

> "The record shows that immediately upon being physically confronted with Raymond Carter, * * they admitted the crime. Can it reasonably be said at that point that it was unnecessary or unreasonable for the police to take the time to reduce the statements to writing and have them signed? No court has yet held that a reasonable period of time elapsing between the occurrence of an oral confession and the time reasonably necessary to reduce it to writing for it to be signed is 'unnecessary delay' and we are not prepared to do so now."

■ So in the case at bar, if the defendant was willing to demonstrate how the crime was committed, it would be amazing to hold that the police should not have taken the time to permit him to do so.

At times questioning of a suspect by the police is discussed as though there is something furtive, sinister or reprehensible about it. There is no reasonable basis for such an attitude. There is nothing inherently evil in the examina-

tion of a suspect by the police. On the contrary, it is the duty of the police to question a prisoner promptly after his arrest, provided that this process does not degenerate into a prolonged and oppressive interrogation. This duty is owed by the police both to the public and to the defendant for the protection of each.

Accordingly, the court admitted Captain Hartnett's testimony concerning the so-called "re-enactment" of the crime that took place at 2:15 p. m. at the scene where it had been committed. The principal portions of his testimony on this point are as follows (Tr. pp. 162, 163, 164, 165, 166):

"We arrived at the apartment and entered, and * * * I told the defendant that I wanted him * * * to go through the same motions that he had on the night the offense occurred. He said all right * * *

"He walked back to the rear of the first floor and he picked out the apartment door on the lefthand side, which was apartment A, the apartment of the deceased. When we got to the front door of this apartment I asked him, 'Why did you pick this particular apartment?'

"And he said, 'I noticed a light around the edges of the door.' The door was open, just a little bit, 'I could see the light.' * * * 'I opened the door and I said something. I don't know what I said but I said something to see if anybody would answer * * * 'Nothing happened, so I opened the door and I went in. I looked around the apartment with a quick look and there was nobody there.'

* * * * * *

" 'I went over to this table,' and he went over to a table in the living room, and he said there were three or four dollar bills on the table * * * 'I took those and I went into the drawer of this same table,' and he said * * * 'there were two or three dollars in change in that drawer' and he took that.

* * * * *

"Then we went around to all the tables, to a wardrobe locker in the living room, and he said he went through all these places. Then he went into the bedroom and he pointed out the dresser and said he had taken out the drawers and gone through the drawers. He then went into the bathroom and there was one cabinet in there that had a drawer in it, he took that drawer out, he went through that and he didn't find anything there. Then he went into the kitchen and he went through two drawers in there. He said he he didn't get anything there. At that time I asked him was it possible that he got the knife out of that drawer. He said, 'No, I had my own knife, I brought it with me.'

* * * * *

" 'Well, I was back in the living room and I was just about getting ready to leave, * * * when this woman came in. * * * It was a big woman. And she said, 'What are you doing here? Get out, get out, get out.'

"At the same time she threw something at him. * * * It made him mad and he took his knife and he rushed her. He says, 'I hit her.' 'After that, I am not too sure.' I know I saw blood squirting out. * * * I am a little blank after that, * * * the next thing that I remember was pulling the knife out of her chest. * * * Then I wiped the blood off of the knife on her dress. * * * I felt something wet in my hand and I looked and I saw that I had blood.'

* * * * *

" 'Well, I went into the kitchen. * * * I laid the gloves on top of the stove' and he indicated how he laid them on the stove. He said he

lit the stove and when the gloves started burning real good he turned the gas off and then he went back out into the living room. Then he said, when he got out into the living room he realized it was the woman's pocketbook that she threw at him because he saw it there on the couch and he knew that it wasn't there before that. So he turned the pocketbook upside down and dumped out what was in it and that included a billfold and also some paper envelopes. He said he got a ten dollar bill and then he left the apartment.

\* \* \* \* \*

"At the time he demonstrated how he laid the gloves on the stove I asked him, 'Why did you wear gloves in the first place?' And he said, 'Well, I figured on handling a lot of things and I didn't want to leave any prints.' "

After the re-enactment was completed at about 2:45 p. m., the defendant was immediately brought to police headquarters, where an appropriate record, known as a "line-up sheet", was prepared, and his fingerprints and photographs were taken in the Identification Bureau. This process was completed at about 3:40 p. m., when the defendant was conducted to the office of the United States Commissioner. A preliminary hearing took place at about 4:00 p. m.

Manifestly the problem is not whether there was any unnecessary delay between 1:30 p. m., when the defendant arrived at the police station, and 4:30 p. m., the time of the preliminary hearing, although obviously a three-hour interval cannot be deemed unreasonable. Actually the question is whether there was any unnecessary delay between 1:30 p. m. and 2:45 p. m., when the re-enactment of the crime was completed.[4] The court is not aware of any case in which one and a quarter hours was deemed an undue interval following an arrest.

At the preliminary hearing the defendant was bound over for the grand jury and committed to jail. Two days later Lt. Culpepper and Lt. Donahue of the Police Department interviewed him in the rotunda of the jail. The defendant was asked by Lt. Donahue whether he would discuss the incident with his visitors and agreed to do so. He freely repeated the story, which he had previously related to Lt. Culpepper at the police station and to Captain Hartnett at the apartment. It would be unnecessary reiteration to summarize it again.

Counsel for the defendant interposed two objections to the admission of Lt. Donahue's testimony concerning the confession made by the defendant at the jail: first, that the confession was involuntary, although he did not specify any grounds for this contention; and, second, that it was obtained in violation of the rule of the Mallory case. Accordingly, the court held a preliminary hearing on the question whether the confession at the jail was voluntary. Lt. Donahue testified that when he and his companion arrived at the jail, they filled out a form indicating that they desired to see the defendant; that this card was taken to the defendant by a prison guard, who enquired of him whether he was willing or desired to see his visitors; and that the defendant replied in the affirmative. Lt. Donahue testified that the defendant was brought out into the rotunda of the jail and that the two police officers and the defendant were then assigned to a table, and that the three sat down around it.

The defendant was greeted by the police officers and there was an exchange of amenities such as might be expected on a social visit. Lt. Donahue testified that he then advised the defendant that the latter did not have to make a statement; that if he had not as yet consulted an attorney, he had a right to do so before talking; that the defendant was asked whether he recalled having been given the same advice by the United States Commissioner. The defendant replied that he had told the rest of the po-

4. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

lice officers and he saw no reason why he would not tell Lt. Donahue. The latter then requested the defendant to recount what had occurred at 225 Massachusetts Avenue and, as stated above, the defendant narrated what had taken place.

■ No evidence was tendered in support of the objection that the confession at the jail was involuntary, although the court expressly called to the attention of defense counsel that it was its practice at preliminary hearings as to admissibility of a statement, to permit the defendant to take the witness stand and to confine his testimony to the narrow issue involved in the hearing, without waiving his general privilege against self-incrimination and without subjecting himself to cross-examination on other issues of the case. The defendant did not avail himself of this opportunity. The statement made at the jail was clearly voluntary and the objection on that ground was overruled. In fact it should be observed that there is no suggestion that the defendant was physically mistreated by the police at any time, or that any mental or moral pressure was exerted against him.

■ The objection that the confession was obtained in violation of the principle of the Mallory case was likewise untenable. The purpose of that doctrine is to enforce compliance with the requirement that an arrested person be brought before a committing magistrate within a reasonable time after being taken into custody. It imposes a penalty for failure to comply with this rule. The principle obviously has no application to any statements obtained or made after the defendant has appeared before a magistrate.

In Goldsmith v. United States, 107 U.S.App.D.C. 305, 311, 277 F.2d 335, to which reference has already been made in another connection, the Court of Appeals expressly ruled that the Mallory case does not apply to statements made by a prisoner subsequently to a hearing before a committing magistrate.[5]

Finally, it should be observed in connection with the discussion of the objections to the introduction of all of the foregoing evidence, that even if the canvas bag and its contents were excluded, and even if the so-called re-enactment of the crime at the apartment were not admitted, this court would still arrive at the same conclusion that it has reached on the basis of the statement made to Lt. Culpepper at the police station immediately after the defendant was brought there,[6] and the confession repeated at the jail to Lt. Donahue. In fact either one of these statements standing alone is sufficient to connect the defendant with the crime.

■ At the conclusion of the evidence presented by the Government, counsel for the defendant moved for a judgment of acquittal on the ground that the *corpus delicti* had not been sufficiently proven as to the first count of the indictment. It has indeed been the traditional doctrine that the *corpus delicti* in any criminal case must be established by evidence independent of any confession or admission of the defendant, and that confessions and admissions may be used only to connect the defendant with the crime. Again, the historic rule has been that in homicide cases proof of *corpus delicti* consists of, first, evidence of the death of the victim; and second, evidence that the death occurred as a result of foul play, Murray v. United States, 53 App. D.C. 119, 127, 288 F. 1008; Evans v. United States, 10 Cir., 122 F.2d 461, 465. Unquestionably, this rule has been fully complied with in the instant case. As indicated above, the death of the victim and the fact that her demise was brought about by criminal means, namely, stab wounds, were established beyond a reasonable doubt by evidence entirely independent of the defendant's admissions or

---

5. See also United States v. Bayer, 331 U.S. 532, 540–541, 67 S.Ct. 1394, 91 L. Ed. 1654.

6. See United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

---

confessions. It is urged by counsel for the defendant, however, that the *corpus delicti* under the first count of the indictment includes an additional element, namely, independent proof that the death occurred in the perpetration of a housebreaking. No authority is cited in support of this contention and the court does not agree with it. That the homicide was committed in the course of the perpetration of another felony is merely one of the circumstances that classifies the homicide into the appropriate category. It is a substitute for premeditation and deliberation. It has never been the rule that proof of premeditation and deliberation is part of the *corpus delicti*. Actually, however, that the killing took place in connection with the housebreaking was established by evidence independent of the defendant's statements. The facts that the victim's dead body was found lying on the floor of her apartment and that the apartment was in disarray, with its closets, bureau drawers and table drawers exposed and rifled, and her empty pocketbook found open and lying on the couch, are sufficient to establish that there had been a housebreaking and that the homicide took place in connection with it.

Moreover the rigid requirement that the *corpus delicti* must be proven by evidence entirely aside from the defendant's admissions, is no longer in force. It was modified by the Supreme Court in Opper v. United States, 348 U. S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101, where Mr. Justice Reed wrote as follows:

"we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. * * * It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth."

The court *sua sponte* made an exhaustive examination of the authorities on the question what constitutes a murder committed in perpetrating a housebreaking. Without exception, in construing such statutes, the authorities hold that to be committed in the perpetration of a burglary or housebreaking, the homicide need not take place during the moments when the accused is actually breaking and entering into the premises. If they were to be so limited, such statutes would be reduced to futility and could hardly ever be invoked. The rule that penal statutes must be construed strictly does not require that their words should be narrowed to the exclusion of what the legislature obviously intended to embrace, and their purpose must not be defeated by a forced or unreasonable construction.[7] The overwhelming weight of authority is to the effect that if the homicide is committed within what is referred to as the *res gestae* of the burglary or housebreaking, that is, in connection with it, the killing constitutes felony murder. It suffices if the burglary and the homicide are parts of one continuous series of acts connected with each other. This doctrine applies if the burglary or housebreaking had been technically completed and the criminal is gathering his plunder and is preparing to make his departure when he kills his victim. This principle is extended to a situation where the defendant has left the premises, is endeavoring to make his escape, and kills someone while being pursued.

---

7. *United States v. Hartwell*, 6 Wall. 385, 395–396, 18 L.Ed. 830; *United States v. Alpers*, 338 U.S. 680, 681, 70 S.Ct. 352, 94 L.Ed. 457; *United States v. Bramblett*, 348 U.S. 503, 509, 75 S.Ct. 504, 99 L.Ed. 594; *Arroyo v. United States*, 359 U.S. 419, 424, 79 S.Ct. 864, 3 L.Ed.2d 915.

One of the leading cases on this subject is the decision of the Supreme Court of Missouri in State v. Adams, 339 Mo. 926, 98 S.W.2d 632, 637, 108 A.L.R. 838, where this doctrine is summarized as follows:

"It is held in many jurisdictions, including Missouri, that when the homicide is within the *res gestae* of the initial crime and is an emanation thereof, it is committed in the perpetration of that crime in the statutory sense. Thus it has been often ruled that the statute applies where the initial crime and the homicide were parts of one continuous transaction, and were closely connected in point of time, place and causal relation, as where the killing was done in flight from the scene of the crime to prevent detection, or promote escape."

In that case a burglar, who had been interrupted by the police, endeavored to escape by fleeing into nearby woods and fatally shot a pursuing officer. It was held that the killing constituted murder in the perpetration of a burglary.

In Conrad v. State, 75 Ohio St. 52, 78 N.E. 957, 958–959, 6 L.R.A.,N.S., 1154, a burglar escaped through a window from the building into which he had broken, and at about 25 or 50 feet from the house he fatally shot a police officer who was pursuing him. The homicide was deemed to constitute felony murder, and the contention that it was not connected with the burglary was overruled. The court stated:

"If this construction were to be given to the statute, it would be quite impracticable to ever convict for a murder committed in the perpetration of any of the felonies mentioned in this section."

In State v. Hauptmann, 115 N.J.L. 412, 180 A. 809, 820, the court stated:

"As to the argument that the crime of burglary is complete when there is a nocturnal breaking and entering with intent, that is doubtless true for the purposes of a conviction of burglary; but we think it not applicable to a homicide in the commission of a burglary. It would be strange indeed if this court were to hold, in a case where a burglar has made his entry, is packing up his loot, is challenged by the master of the house, and shoots and kills him, that the statutory first degree rule does not apply because the 'burglary' is complete."

Numerous cases support the foregoing proposition, among which are the following: People v. Green, 217 Cal. 176, 17 P.2d 730; Bissot v. State, 53 Ind. 408, 413; Francis v. State, 104 Neb. 5, 175 N.W. 675, 676; Commonwealth v. Carey, 368 Pa. 157, 82 A.2d 240; Commonwealth v. Tauza, 300 Pa. 375, 150 A. 649, 650.

New York applies a somewhat narrower definition and limits murder committed in the perpetration of a burglary to a killing that takes place while the burglar is still on the premises. It does not extend the rule to a situation where the burglar has left the premises and kills some one while in flight. People v. Marwig, 227 N.Y. 382, 125 N.E. 535, 22 A. L.R. 845; People v. Walsh, 262 N.Y. 140, 186 N.E. 422, 424; People v. Giro, 197 N.Y. 152, 90 N.E. 432; People v. Huter, 184 N.Y. 237, 240, 77 N.E. 6.

In Dolan v. People, 64 N.Y. 485, 497, it was recognized, however, that:

"If a burglar breaks into a dwellinghouse * * *, the offence is doubtless complete before he leaves the building, but he may be said to be engaged in the commission of the crime until he leaves the building with his plunder; and if, while there engaged in securing his plunder, or in any of the acts immediately connected with his crime, he kills any one resisting him, he is guilty of murder under the statute."

Consequently, even under the narrow New York rule, the homicide in this case constitutes murder in the first degree, because it was committed while the defendant was securing his loot and

preparing to leave the premises into which he had broken. No authorities to the contrary were cited by counsel for the defendant, as apparently his research did not result in finding any.

In this jurisdiction Tyler v. United States, 90 U.S.App.D.C. 2, 193 F.2d 24, is on all fours on its facts with the instant case. There the defendant broke into a department store and while prowling inside killed two watchmen who obstructed him. A conviction of murder in the first degree while perpetrating a housebreaking was affirmed without discussing this question of law.

As to the second count of the indictment, the court at the conclusion of the Government's case reduced the charge to murder in the second degree on the ground that there was no evidence of premeditation and deliberation.

As to the fourth count charging petit larceny, counsel for the defendant moved for a judgment of acquittal for lack of proof of *corpus delicti*. The Court denied the motion holding that the presence of the open wallet lying on the couch was sufficient corroboration of the defendant's admission within the doctrine of the Opper case, supra.

 Accordingly, the court concludes that the Government has established beyond a reasonable doubt that the defendant committed murder in the perpetration of a housebreaking while armed with or using a dangerous weapon, as charged in count one of the indictment; that he committed murder in the second degree as charged in the second count of the indictment; that he committed housebreaking as charged in count three of the indictment; and that he commit-

ted petit larceny as charged in count four of the indictment.

We now reach the issue of the defendant's mental capacity to commit these crimes.

The issue of insanity in a criminal case,[8] whenever it is seriously interposed, must receive careful and thoughtful consideration. On the one hand, a person who is mentally deranged may not be punished for an insane act, not only because to do so would be contrary to law, but also because it would violate the dictates of humanity and common sense. On the other hand, a plea of insanity must not be permitted to become an escape route for persons accused of serious offenses. There are many persons who suffer from mental abnormalities of various kinds, but who, nevertheless, are properly deemed responsible for their criminal acts. Then there are many borderline and doubtful cases. Moreover, the possibility of malingering or shamming insanity as a means of avoiding punishment, is far from unknown. Such *simulation is not invariably detected*. In fact the argot of the underworld has developed a colloquial expression to signify the successful feigning of insanity. In some cases these difficulties are augmented by baffling and bewildering differences of opinion among psychiatrists.

To be sure, in one sense, society is protected irrespective of whether a criminal is incarcerated in a penal institution, or confined in the maximum security ward of a mental hospital. If, however, a person is acquitted on the ground of insanity and is committed to a mental hospital, and then this disposition should be proven to have been erroneous and the criminal is released, the ends of jus-

8. Psychiatrists of today at times try to avoid the word "insanity". They overlook the fact, however, that their predecessors used the word regularly and even wrote treatises the title of which included the term "insanity". In any event the pertinent statutes use the term "insanity" 18 U.S.C. §§ 4241–4248, and D.C.Code 24:301, and consequently the courts cannot avoid it. While an expert witness must be permitted to use the technical terminology of his science or art, one of the expert's functions is to translate such technical jargon into nontechnical phraseology that a layman can understand. This is true of all experts —physicians, psychiatrists, pure scientists, engineers, etc. The problem is not limited to psychiatric matters, but occurs frequently in cases of other types, as for instance, patent cases.

36

tice will have been frustrated and the public will not have been safeguarded. The ultimate result would be a reflection on the administration of justice. All of these considerations on both sides of the subject of insanity in the criminal law must be carefully weighed.

■ The test of what constitutes the type and degree of insanity that relieves a person from responsibility for a criminal act, was formulated for all Federal courts by the Supreme Court in 1895, in Davis v. United States, 160 U.S. 469, 476, 16 S.Ct. 353, 40 L.Ed. 499, and 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750:

"The term 'insanity,' as used in this defense, means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it, and able to distinguish between right and wrong, and know that the act is wrong, yet his will—by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control."

Thus the test is twofold. One aspect of the criterion is whether the person is capable of distinguishing between right and wrong, and is conscious of the nature of his act. This is substantially the test laid down over a century ago in the celebrated M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng.Rep. 718, decided by the House of Lords in 1843. The many criticisms that have been directed from time to time against this standard, are totally irrelevant insofar as the Federal courts are concerned, because the Davis case added another phase to it, which cures its deficiencies, if any. The second feature of the test is whether even if the defendant is conscious of the nature of the act that he is committing, is able to distinguish between right and wrong and knows that his act is wrong,

yet his will has been so completely destroyed that his actions are not subject to it, but are beyond his control. At times this aspect of the criterion is paraphrased as inability to adhere to the right and to refrain from doing wrong. Unfortunately, it has at times been inaccurately referred to as "the irresistible impulse" test. This term connotes that the criminal act must have been the result of a momentary impulse and that the test is not applicable to an act resulting from a deep-seated or prolonged mental derangement. The words "irresistible impulse", however, are not found in the Davis case. The test is broad enough to absolve any person who through mental derangement is unable to refrain from committing a criminal act and to adhere to the right, even though he is aware that what he is doing is wrong. The Supreme Court has never overruled or modified the doctrine of the Davis case, and the test of insanity there enunciated is the law in the Federal courts and is binding on them.

In 1954, the Court of Appeals for the District of Columbia Circuit in Durham v. United States, 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 45 A.L.R.2d 1430, adopted a formula originally devised in New Hampshire in 1870, in State v. Pike, 49 N.H. 399, 407–408, to the effect that the accused is not criminally responsible if his unlawful act was the product of a mental disease or a mental defect. Manifestly, if there is a direct inconsistency between a rule of law laid down by the Supreme Court of the United States, and a rule enunciated by the Court of Appeals, it naturally becomes the duty of the District Court to follow the Supreme Court. There are indeed occasional expressions to the effect that the District of Columbia Circuit occupies an anomalous and semi-autonomous position. These expressions do not go as far as to suggest that affirmative rulings of the Supreme Court may be ignored in the District of Columbia. Actually the legal status of the District of Columbia Circuit is no different from that of any other

Federal circuit. Every circuit comprehends within its boundaries certain Federal areas, often referred to as Federal reservations, over which the Federal courts exercise local criminal jurisdiction in respect to crimes of the type that elsewhere are cognizable in State courts. In some circuits, such as the Eighth and Ninth, the size of Federal areas far exceeds that of the District of Columbia, because of the presence of large national parks. In this respect, there is only a difference in fact, but no distinction in principle, as between the District of Columbia and other circuits, in that in the former the entire circuit constitutes a Federal area and because of its urban character the volume of local business in proportion to its Federal business is much greater than that presented in other circuits.

It becomes necessary, therefore, to analyze intensively the ruling in the Davis case and the formula of the Durham case, and to compare them in order to determine whether there is any inconsistency between them and, if so, to what extent. Under the test as formulated in the Davis case, if the accused is incapable of distinguishing between right and wrong, or is unconscious of the nature of the act he is committing, or even if he is capable of making the distinction and knows that the act is wrong, yet his will power is so completely destroyed by his mental derangement that his actions are beyond his control, he is absolved from criminal liability. Necessarily, if he comes within this formula, his criminal act is the product of his mental disease or mental defect, as the case may be.

On the other hand, if a person can distinguish between right and wrong, and is able to refrain from doing wrong and to adhere to the right in spite of any mental derangement, he is held criminally responsible under the test of the Davis case. At the same time it cannot be said that his act is the product of

mental disease or mental defect under the formula of the Durham case, because in spite of his mental abnormality the defendant is under no misconception of the fact that what he was doing was wrong and is under no compulsion or drive to commit the act. Actually, the two tests are equivalent. The Durham case cannot be said to have changed the law on criminal responsibility of insane persons. It has merely restated the law in a different manner. The test as formulated in the Durham case is phrased in a way that is abstract and perhaps may be deemed more philosophical. As stated in the Davis case, it is concrete and can be more easily understood and applied by the average person.

While I have a mounting admiration for the type of justice meted out by the average jury,[9] nevertheless, since a jury represents a cross-section of the population, and not necessarily an intellectual group, it needs guidance in concrete form. There is no doubt that juries find the test as enunciated in the Durham case vague and difficult of application, because of its general and abstract phraseology. In fact, it has been the observation of this court that even some psychiatrists find difficulty in giving expert testimony within the terminology of the Durham case. Thus there are differences of opinion among psychiatrists what constitutes a mental disease, for instance, whether a person who has a psychopathic or a sociopathic personality is suffering from a mental disease, and the answer may depend on the fortuitous circumstance as to what psychiatrist is called to testify on the subject. Some psychiatrists find difficulty in determining what is meant by a crime being the "product" of a mental disease or mental defect. This difficulty appears in the testimony in this very case.

---

**9.** Cf. statement of Judge Learned Hand in United States v. Garsson, D.C., 291

F. 646, 649: "Juries are not leaves swayed by every breath."

The Durham case has not been followed anywhere, insofar as can be determined by extensive research.

In the following Circuits, the adoption of the rule of the Durham case was expressly urged and explicitly rejected:

Fifth Circuit, Howard v. United States, 232 F.2d 274, 275.
Eighth Circuit, Voss v. United States, 259 F.2d 699, 703.
Ninth Circuit, Sauer v. United States, 241 F.2d 640, 645, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539.

It has also been expressly rejected by the United States Court of Military Appeals, United States v. Kunak, 5 U. S. Court of Military App. 346, 355.

Likewise the Durham case has been expressly rejected by the highest courts of the following States:

Arizona — State v. Crose, 88 Ariz. 389, 357 P.2d 136, 139.
Arkansas — Downs v. State, 330 S.W.2d 281, 283.
California — People v. Nash, 52 Cal.2d 36, 338 P.2d 416, 423.
Colorado — Early v. People, 352 P.2d 112.
Connecticut — State v. Davies, 146 Conn. 137, 148 A.2d 251, 257.
Florida — Piccott v. State, 116 So.2d 626, 627.
Illinois — People v. Carpenter, 11 Ill.2d 60, 142 N.E.2d 11, 15.
Indiana — Flowers v. State, 236 Ind. 151, 139 N.E.2d 185, 194.
Kansas — State v. Andrews, 187 Kan. 458, 357 P.2d 739.
Maryland — Bryant v. State, 207 Md. 565, 115 A.2d 502, 515.
Massachusetts — Commonwealth v. Chester, 337 Mass. 702, 150 N.E.2d 914, 920.
Minnesota — State v. Finn, 257 Minn. 138, 100 N.W.2d 508, 509.
Missouri — State v. Goza, 317 S.W.2d 609, 616.
Montana — State v. Kitchens, 129 Mont. 331, 286 P.2d 1079, 1082.
Nevada — Sollars v. State, 73 Nev. 248, 316 P.2d 917, 921.
New Jersey — State v. Lucas, 30 N.J. 37, 152 A.2d 50, 68.
Pennsylvania — Commonwealth v. Woodhouse, 401 Pa. 242, 164 A.2d 98, 104.
Vermont — State v. Goyet, 120 Vt. 12, 132 A.2d 623.
Washington — State v. Collins, 50 Wash.2d 740, 314 P.2d 660, 668.

—————◆—————

The American Law Institute, in its Model Penal Code has declined to accept the terminology used in the Durham case, and has adopted a formula similar to that of the Davis case.

In the instant case, since the trial is without a jury, this Court will employ the test as phrased in the Durham case.

The Supreme Court ruled in the Davis case, supra, that if some evidence is introduced, irrespective of its source, engendering a reasonable doubt as to whether the defendant was mentally competent at the time of the commission of the crime, the burden is cast upon the Government to prove beyond a reasonable doubt that the defendant was mentally responsible for his crime. In other words, the onus is on the Government to show beyond a reasonable doubt that the defendant either was free of mental disease or mental defect, or that the

crime was not the product of any mental disease or mental defect if he was afflicted with one. This rule has prevailed throughout the Federal judicial system since its promulgation by the Supreme Court in 1895. It follows that if a defendant is acquitted on the ground of insanity, there is no affirmative finding that he was insane at the time of the commission of the crime, but merely a finding that the Government has not established beyond a reasonable doubt that he was not insane or if he was, that the crime was not the product of the insanity. It is entirely conceivable, therefore, that a person who is actually sane may be acquitted on the ground of insanity merely because the Government was not in a position to establish his sanity by proof beyond a reasonable doubt. This is not a fanciful situation, but one that can readily occur.

Some aspects of the procedure relating to the question of insanity in criminal cases in the District of Columbia were modified, however, by a series of amendments to the District of Columbia Code, effected by an Act of Congress approved on August 9, 1955, 69 Stat. 609. Among these amendments is one involving Section 24:301(d) of the D.C.Code, which for the first time introduced a provision that,

> "If any person * * * is acquitted solely on the ground that he was insane at the time of its commission, *the court shall order such person to be confined in a hospital for the mentally ill."* (Emphasis supplied.)

In other words, the Act of 1955 made it mandatory for the court in case a defendant is acquitted on the ground of insanity, to commit him forthwith to a mental hospital. A query necessarily arises whether this provision shifted the burden of proof on the issue of insanity insofar as the District of Columbia courts are concerned. While the statute has been in effect for over five years, this question does not appear to have been raised or discussed in any reported opinion either of the Supreme Court or the Court of Appeals for the District of Columbia and, therefore, it is open in this Court. It is not reasonable to assume that Congress directed the commitment to a mental hospital of persons who had never been affirmatively adjudged mentally incompetent. Confinement in a mental institution is not a punishment, but is intended for the purpose of treating persons who have been found to be mentally ill. We may hardly attribute to the Congress an intention to commit to a mental hospital persons who are sane or persons who have not been affirmatively found insane.

Ineluctable logic, therefore, leads to the conclusion that when Congress directed that any person acquitted on the ground of insanity should be forthwith committed to a mental institution, it intended by necessary implication to provide that an acquittal on the ground of insanity should include an affirmative finding of insanity. It inevitably follows that thereby Congress shifted the burden of proof from the Government to the defendant to estabish the defense of insanity, instead of requiring the Government, in effect, to disprove it. Necessarily, proof on behalf of the defendant on this issue would not have to be beyond a reasonable doubt, but proof by a preponderance of evidence would be sufficient. There is no question that it is within the purview of the legislative branch of the Government to regulate the burden of proof, and that it is not violative of due process of law to cast on the defendant the burden of proof on the issue of insanity, Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302.

There is internal evidence in the Act of 1955 that Congress understood that an acquittal on the ground of insanity could be predicated only on an affirmative finding of insanity. Thus, in amending D.C.Code, Section 24:301, the Congress provided in subsection (e) a procedure

whereby any person confined in a mental hospital pursuant to an acquittal on the ground of insanity, may be released. One of the conditions precedent for the release is that the Superintendent of the hospital shall certify that such person *has recovered* his sanity. Obviously, it cannot be certified that a person has *recovered* his sanity, unless he had been previously affirmatively found insane.

That such was the intent and purpose of Congress is further evidenced by the Committee Reports concerning this legislation. Thus, Senate Report 1170 (84th Congress, 1st Session) presented by Senator Morse on July 27, 1955, contains the following statement (P. 13):

> "Where accused has pleaded insanity as a defense to a crime, *and the jury has found that the defendant was, in fact, insane at the time the crime was committed,* it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered." (Emphasis supplied.)

The same statement is found in House Report No. 892 (84th Congress, 1st Session) presented by Congressman McMillan, on June 22, 1955 (p. 13).

While this court is of the opinion that the rule as to the burden of proof on the issue of insanity has actually been shifted by the Act of Congress from the Government to the defendant, nevertheless, as this question was neither raised nor argued at this trial, the court feels that it should not act upon the view here expressed without according to counsel an opportunity to be heard. Moreover, the Government assumed that it was required to bear the burden of proof beyond a reasonable doubt, as required by the Davis case, that the defendant was either free from mental disease or mental defect at the time of the commission of the crime, or that, if he was afflicted with either there was no causal connection between the defendant's mental condition and the crime. The trial was conducted on this basis. The court will, therefore, decide this case on the theory that this burden has to be borne by the Government, and that unless the court finds that it has been established beyond a reasonable doubt, that the crime was not the product of any mental disease or any mental defect, the defendant should be found not guilty on the ground of insanity.

We shall, therefore, now proceed to analyze the evidence on this issue. At the outset it must be said that proof beyond a reasonable doubt does not mean that the evidence must be entirely one-sided, or that it must amount to proof beyond all doubt whatsoever. It need be proof to a moral certainty and not proof to an absolute certainty. It must be such degree of proof as will result in an abiding conviction of the defendant's guilt in the mind of the trier of the facts, that is, on this issue, an abiding conviction that the defendant was either free of mental disease or mental defect, or that if he was afflicted with either, the crime was not the product thereof. Wilson v. United States, 232 U.S. 563, 569–570, 34 S.Ct. 347, 58 L.Ed. 728; Egan v. United States, 52 App. D.C. 384, 393, 287 F. 958; Bishop v. United States, 71 App.D.C. 132, 138, 107 F.2d 297.

The Supreme Court in Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U.S. 612, 619–620, 4 S.Ct. 533, 536, 28 L.Ed. 536, in an opinion by Mr. Justice Harlan, indicated that lay testimony on the issue of insanity is admissible and must be considered, and that in fact, it may be valuable. Specifically, it held that a layman may express an opinion based on his own observations as to whether a person is of sound or unsound mind. On this point the court stated:

> "Whether an individual is insane, is not always best solved by ab-

struse metaphysical speculations, expressed in the technical language of medical science. The common-sense, and, we may add, the natural instincts of mankind, reject the supposition that only experts can approximate certainty upon such a subject."

This principle was expressly held applicable to criminal cases in an opinion by Mr. Justice Holmes, in Queenan v. Territory of Oklahoma, 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175. This doctrine has been followed in this jurisdiction, Turner v. American Security and Trust Co., 29 App.D.C. 460, 467.

Within the past year, the Judicial Committee of the Privy Council in Attorney-General for the State of South Australia v. Brown, [1960] A.C. 432, 452, observed that

"The previous and contemporaneous acts of the accused may often be preferred to medical theory."

Thus, lay testimony on the issue of insanity may be of two kinds: opinions of lay witnesses based on their own observations; and evidence of the previous and contemporaneous acts of the accused.

In this case, as appears from the summary of facts heretofore given, the defendant carefully planned every step of his offense. He first armed himself with a knife or bayonet for his protection; he put on a pair of gloves in order to avoid leaving fingerprints; he selected an apartment to which the door was ajar and where lights were burning; and he took steps to ascertain whether any one was inside before entering. Immediately after the commission of the crime, he endeavored to destroy evidence and to go into hiding; he tried to burn the gloves that he had worn; he wiped the blood off the knife and then put it back in the bag; he washed blood off his hands; he carefully refrained from returning home and took a night's lodging elsewhere;

and he informed his brother that he would go away for awhile, as he had done something awful. All these acts are rational, such as might be performed by a normal individual bent on crime. To be sure, he made some mistakes, which led to his detection. This fact is, of course, no indication of symptoms of any mental aberration. The fact is that all criminals commit mistakes and it is generally their own errors that lead to their apprehension and conviction. A perfect crime is unknown.

In this case, however, the psychiatric testimony is so abundant, weighty and so nearly one-sided that the court will predicate its conclusion entirely on the expert evidence without regard for the lay testimony just summarized. Shortly after his arrest, the defendant was committed to the District of Columbia General Hospital for examination to determine whether he was competent to stand trial. Then he was transferred to Saint Elizabeths Hospital, where he remained for some months. On two other occasions he had a stay at Saint Elizabeths of about one month each. In addition, he was examined on four occasions by an expert psychiatrist in private practice, Dr. John R. Cavanagh. While each of the psychiatrists who testified in this case made such an examination as he deemed adequate, nevertheless, the fact remains that the staff of Saint Elizabeths Hospital had a long and continuous contact with the defendant and, therefore, a better opportunity for intensive study and observation from day to day than the other experts.

Dr. William G. Cushard, who has been connected with Saint Elizabeths Hospital for over thirty years and who is the Clinical Director of Branch No. 3 of the Hospital, gave the following pointed and unequivocal opinion concerning the defendant's mental condition (Tr. 747–748):

"It was my opinion, and it still is, that Mr. Naples had a very poorly developed, very poorly integrated

type of personality structure, but he was not, in my opinion, suffering from a mental disease and he was not suffering from a mental deficiency."

On cross-examination, he emphasized his previous testimony (Tr. p. 751):

"Q. Why do you say John Naples has no mental disease?

"A. Because I didn't find any symptoms of mental disease."

Dr. David J. Owens, who is the chief of John Howard Pavilion, which is part of Branch No. 3 over which Dr. Cushard presides, gave the following testimony concerning the defendant's mental condition (Tr. pp. 372–373):

"* * * in my opinion, this individual had a personality disorder, but it was not severe enough to class it as a mental disease."

Dr. Mauris M. Platkin, also a member of the psychiatric staff of Saint Elizabeths Hospital, was the admitting physician at John Howard Pavilion where the defendant was first taken upon his original commitment to the hospital. In addition he examined and observed the defendant from time to time during his stay at the Hospital. He testified (Tr. 515) that the defendant had an inadequate personality, but that he was not suffering from a mental illness or disease. His testimony continued as follows (Tr. 516):

"Q. You say, sir, that you found an inadequate personality. What do you mean by that?

"A. This is simply a type of personality which is inadequate to make what is generally termed a normal or an average adjustment to living, but it does not necessarily mean that it is a mental illness, and in this instance I see no evidence of mental illness."

The doctor added that it was his position that the defendant had an inadequate personality, but was not suffering from a mental illness. On cross-examination (Tr. 524) he repeated that he did not see anything that he would construe as a mental disease. When asked why he did not find that the inadequate personality amounted to the degree of a mental disease, he replied (Tr. 524–525):

"Simply because I don't see sufficient distortion of reality or fragmentation of the personality or distortion of his apprehension of the environment. I don't see disorientation, I don't see distortion of sensory receptiveness in the form of hallucinations, I don't see any ideas that so distort reality as to amount to delusions that would suggest mental illness or, at least, a psychosis. I don't see any internal degree of anxiety and tension, with substituted mechanisms, that often result in a neurosis."

"What I see is simply a maladjusted personality, which technically is referred to as an inadequate personality."

Again, the doctor stated (Tr. 527):

"This man was in good contact with his environment in all the time that I had contact with him."

Later he said (Tr. 532):

"Q. Did this crime in this case point up anything that might tend toward mental illness as a reason?

"A. Not so far as I am aware, reviewing all the information and data available to me there was nothing about it to suggest that there was a mental illness involved in the commission of the act."

He finally concluded (Tr. 593):

"Q. I believe you have already stated that, in your opinion, the question as to his having a mental illness was not even close?

"A. No, sir, I don't think it was particularly close. I don't think he showed enough in the way of

symptomatology that was significantly suggestive of mental illness."

Dr. Stephen Klinger, also a member of the staff of Saint Elizabeths Hospital, testified that in his opinion the defendant was suffering from a personality disorder, known as inadequate personality, and that this condition is a mental illness. His testimony then proceeded as follows (Tr. 676–677):

"Q. Did you form any opinion as to whether the mental condition, the personality disorder, was connected with and produced the act of killing with which he is charged?

"A. I couldn't find anything that would indicate that the alleged crime was a product of his mental condition."

Dr. Mary V. McIndoo, the head of the Psychiatric Service of the District of Columbia General Hospital, expressed the view that the defendant was psychotic at the time of the commission of the crimes with which he was charged. Her opinion was that his acts were the product of his mental condition. She later indicated, however, that in her opinion the housebreaking was not the product of mental illness, but that the killing was. She differentiated between the two crimes. She was asked by the court what would be her opinion on the last mentioned point if, instead of stabbing his victim the defendant had hit her with his fist. Her reply was that this would not have been related in any way to a mental illness, but would be the natural thing to do in attempting to escape.

On cross-examination it was brought out that Dr. McIndoo had a conference with Government counsel when the defendant was about to be discharged from the District of Columbia General Hospital, and informed counsel that she was returning the defendant as being of sound mind; but that later in the day she telephoned Government counsel and stated that after consultation with another psychiatrist she was changing her opinion. This vacillation and rapid change

of front necessarily detracts from the weight to be accorded to her testimony in this instance, no matter how accomplished she may be in her field.

Dr. Cavanagh, as heretofore stated, examined the defendant on four different occasions. His first diagnosis was that the defendant was afflicted with an unclassified psychosis and epilepsy. He later revised his diagnosis and reached the conclusion that the defendant was suffering from a post traumatic chronic brain syndrome, epilepsy, and retrograde amnesia. He explained that the chronic brain syndrome was a permanent mental defect due to a brain injury. He expressed the view that there was no connection between the housebreaking that the defendant committed and his mental condition. He was of the opinion, however, that at the moment when he committed the attack on the deceased he was in an epileptic seizure and that, therefore, the murder was the product of his mental condition. He added (Tr. 832):

"If I felt that he was not in a seizure, I would feel, then, that he had only his basic condition, which was a chronic brain syndrome, as a result of which I feel he had a knowledge of what he was doing and could have avoided what he was doing."

He further testified as follows (Tr. 843):

"It would be my opinion that if the seizure had not developed, if there were present only the chronic brain syndrome, then full responsibility for the offense would be present.

"The Court: Therefore, the question of causal relationship between the mental condition and the crime hinges on the question whether the defendant, at the time of the killing, was in an epileptic seizure, is that correct?

"The Witness: That is correct, Your Honor."

To summarize Dr. Cavanagh's testimony on this point, he was of the opinion that the defendant was in a state of

epileptic seizure at the time of the attack on the deceased and that, therefore, the murder was the product of the defendant's mental condition. Dr. Cavanagh concluded, however, that if the defendant, in fact, were not in a state of epileptic seizure at the moment of the murder, there would have been no causal connection between the murder and the defendant's mental condition, because the chronic brain syndrome standing alone would not have brought about the murder.

Dr. Cavanagh is a psychiatrist of high standing and long and broad experience. His views are entitled to respect. The court, having the responsibility for reaching a decision, is not at liberty, however, to disregard entirely the fact that in this case his opinion is not shared by any of the other psychiatrists who have testified at the trial. Obviously, the opinion that the defendant was in a state of epileptic seizure at the critical moment is a matter of conjecture and speculation, even though it be scientific speculation. Dr. Cavanagh predicated it on the postulate that the defendant was unable to remember what happened between the moment when the deceased entered the room and threw an object at him, and the moment at which the defendant saw her bleeding body prostrate on the floor. The doctor stated, however, that if the defendant had a recollection of what had occurred during those few seconds, this fact would change his opinion radically. To quote his words (Tr. 861):

"If the defendant said to me, 'I remember taking out the knife and stabbing her', this would change my opinion radically. He has never said this to me and neither has anyone else."

True, on each of the four occasions on which Dr. Cavanagh interviewed the defendant, the latter stated that his mind was blank as to what had occurred at the crucial moment. The testimony clearly shows, however, that while the defendant did not vary his version of the events in its principal outline, his various statements to different persons differed in matters of detail. This was not unnatural as it is a well known psychological fact that a person is not likely to narrate the same story several times in exactly the same way.

On at least two occasions the defendant stated that he remembered attacking the woman and striking her with his knife. Thus, Dr. Owens testified that in his interviews with the defendant, the latter did not display any absence of memory as to what occurred on the night in question (Tr. 383). Again he testified as follows on this point (Tr. 462):

"Q. Now, when he subsequently related the details, what did he say that happened after this lady appeared in the doorway and then threw something at him? What did he say happened?

"A. That when she appeared at the doorway he became frightened and upset. This is the best of my recollection, not in his own words but similar to what he said. And that she wanted to know what he was doing there, and he didn't know exactly what to do. She screamed at him, threw something at him. He got upset, pulled a knife out, ran toward her, stabbed her in the throat or cut her in the throat with it, and then she fell and he stabbed her in the chest."

Thus, in recounting the events of that evening to Dr. Owens, the defendant had full recollection of his attack on the deceased.

So, too, according to Captain Hartnett, the defendant stated to him (Tr. 164):

"He said, 'Well, I was back in the living room and I was just about getting ready to leave,' he said, 'when this woman came in.' He said it was a big woman. And she said, 'What are you doing here? Get out, get out, get out!'

"And he said, 'at the same time she threw something at him. He thought it was a book. He said when she threw that at him it made him mad and he took his knife and he rushed her. He says, 'I hit her'."

Captain Hartnett's oral testimony on this point was supported by the notes that he made within two or three days after his interview with the defendant at the apartment house. His handwritten notes contain the following statement (Tr. 259):

"Then he got mad, pulled his knife and rushed her, struck her three or four times."

It is clear that if he had had before him, or had heard the statements made by the defendant on this point to Dr. Owens and to Captain Hartnett, Dr. Cavanagh would not have been of the opinion that the murder occurred during an epileptic seizure, but on the contrary would have reached an opposite conclusion,—that there was no connection between the murder and the defendant's mental condition (Tr. 832 and 861).

To recapitulate the expert psychiatric testimony, we find that all of the expert witnesses agreed that there was no causal connection between the housebreaking and the defendant's mental condition. All of them, except Dr. McIndoo and Dr. Cavanagh, agreed that there was no causal connection between the murder and the defendant's mental condition. The probative value of Dr. McIndoo's opinion to the contrary was adversely affected by her rapid and unexplained change of view. Dr. Cavanagh arrived at his conclusion because certain information, just summarized, was not available to him. On the basis of his own reasoning if he had been in possession of this data, he would have reached a contrary result, namely, that there was no causal connection between the murder and the defendant's mental condition.

The conclusion is inescapable that the Government has established beyond a reasonable doubt that none of the crimes charged in the indictment was the product of any mental disease or any mental defect, even if the defendant was afflicted with one.

Accordingly the court finds the defendant guilty of murder in the first degree on the first count of the indictment; guilty of murder in the second degree on the second count of the indictment; guilty of housebreaking on the third count of the indictment; and guilty of petit larceny on the fourth count of the indictment. As, in duty bound, the court will impose the sentence prescribed by the mandate of the Congress on the first count of the indictment. No discretion is reposed in the court in this matter. Sentence on counts 2, 3, and 4, will be held in abeyance for the time being.

I am strongly of the opinion, however, that in this case the extreme penalty of the law should not be carried out. Immediately upon imposition of sentence, I shall forward to the Attorney General a recommendation that the death sentence be commuted to life imprisonment. If deemed necessary for the protection of the public, the commutation can be accompanied by a provision that the defendant should not be eligible for parole. The reason for this recommendation is that while the evidence affirmatively establishes beyond a reasonable doubt that the defendant is mentally responsible for his criminal acts, nevertheless, it also demonstrates that the defendant is mentally below the average and is in fact subnormal. All psychiatrists agree that at least he has a personality disorder. On this point the lay testimony given by a benevolent, veteran school teacher, who for many years taught classes of atypical pupils; and by a kindly, understanding custodian of the school which the defendant attended as a boy, is very helpful. In my opinion dictates of reason and humanity bar the infliction of a death sentence on a person such as this defendant.

The subject of so called "diminished responsibility" in cases of subnormal individuals has been discussed from time

to time in recent years,[10] but can be adopted in this jurisdiction only by an Act of Congress. Nevertheless, it is a matter that in the exercise of discretion the Executive branch of the Government may and should consider in connection with the exercise of Executive clemency.

In making my recommendation to the Attorney General I shall urge that the question of Executive clemency be considered expeditiously at this time, instead of requiring the defendant first to exhaust his remedies by appeal. There are two reasons for this course: first, the ground on which my recommendation is based is not a matter that lies within the cognizance of an appellate court and cannot be considered by it; second, to require the defendant to spend many months in a death cell awaiting a final decision would in itself result in severe mental punishment and agonizing suspense.[11]

As this is a capital case, the court will immediately grant leave to appeal *in forma pauperis* and will designate Mr. Charles B. Murray as counsel to prosecute the appeal and to prepare, present and prosecute an application for Executive clemency. The Court feels that it is good policy to designate trial counsel to act also as counsel for purposes of the appeal in view of his familiarity with the matter. Other counsel who did not participate in the trial, would be handicapped by that circumstance. The court will instruct Mr. Murray to file a notice

of appeal in due time in order that appellate jurisdiction may attach, and to prepare and present an application for Executive clemency forthwith. The court suggests that an application may properly be made to the Court of Appeals to postpone further steps in connection with the appeal until after the disposition of the application for Executive clemency.

---

10. In 1957 England adopted the doctrine of "diminished responsibility" for subnormal individuals who were, however, mentally responsible for their acts. This provision is found in the Act of March 21, 1957, Sec. 2, subsections 1 and 3, Public General Acts 1957, p. 16.

(1) "Where a person kills or is a party to the killing of another, he shall not be convicted of murder if he was suffering from such abnormality of mind (whether arising from a condition of arrested or retarded development of mind or any inherent causes or induced by disease or injury) as substantially impaired his mental responsibility for his acts

and omissions in doing or being a party to the killing.

\* \* \* \* \*

(3) "A person who but for this section would be liable, whether as principal or as accessory, to be convicted of murder shall be liable instead to be convicted of manslaughter." See Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318 90 L.Ed. 1382.

11. Cf. the English practice under which a death sentence is either affirmed and carried out, or reversed, or commuted within four to six weeks after the trial.